MISSISSIPPI POWER & LIGHT CO. *v.* TOWN OF COLDWATER

No. 40824 November 3, 1958 106 So. 2d 375

January 6, 1958 99 So. 2d 443

618

May 4, 1959 112 So. 2d 222

*Green, Green & Cheney, Byrd, Wise & Smith,* Jackson; *Fant & McClure,* Sardis; *Fred B. Smith,* Ripley, for appellant.

620

624

*Sumners & Hickman,* Oxford; *Johnson & Trout,* Senatobia; *John D. Eldridge, Jr.,* Augusta, Arkansas, for appellees.

Lee, J.

The Mississippi Power & Light Company, by its original and supplemental bills, sought, in the Chancery Court of Tate County, an injunction against the Town of Coldwater, North Central Mississippi Electric Power Association, a corporation, and Woodruff Electric Co-Operative Corp., a corporation, to prevent the consummation of certain alleged illegal proceedings already had and about to be had in connection with the acquisition by the Town of an electric distribution system. A temporary injunction was issued.

The answers of the defendants denied in detail the material allegations of the bills.

On the hearing to dissolve, the complainant offered evidence as follows:

The complainant, a Florida corporation, has had a nonexclusive electric franchise to operate in DeSoto County since November 4, 1927; and has had such a franchise in the Town of Coldwater since November 11, 1941, where, on March 29, 1956, it had between 325 and 350 customers. It is a taxpayer in the town, and, through the years, has been ready, willing and able to supply electric energy to anyone in the town, and has actually supplied such energy to those who desired it. In addition, on August 8, 1956, it filed with the Public Service Com-

mission, in accordance with Chapter 372, Laws of 1956, its application for a certificate of public convenience and necessity, showing its then operation under franchises in those areas.

For several years prior to March 29, 1956, North Central, chartered under the laws of this State, with its domicile in the Town of Coldwater, where it owns real estate, pays taxes, and has 18 or 20 customers, had been operating as a co-operative in that area.

Woodruff was chartered under the laws of Arkansas as an R. E. A. Co-Operative with its domicile at Augustus, Arkansas, for the purpose of serving seven counties in the eastern part of that state.

In 1956 North Central was operating at a loss. It was "not exactly broke, but badly bent". In fact at the end of July 1957, its grand total loss including depreciation and other proper charges, was $421,381.92. W. G. Durley was mayor of Coldwater and was also a director and the secretary of North Central.

The official minutes of the Mayor and Board of Aldermen of Coldwater of date of May 14, 1956, showed that a resolution was adopted which declared the intention to issue revenue bonds of the town in the sum of $98,500, to provide funds for the acquisition of an electric distribution system for the town; which called an election to be held on June 12, 1956, to submit the proposition to the qualified electors; which directed the publication of the notice "in the Tate County Democrat, a newspaper published in the city of Senatobia in Tate County, Mississippi, in which the Town of Coldwater is situated, said newspaper being qualified under Chap. 427, Laws of 1956"; and which ordered the election commissioners to conduct the same. The report of the election commissioners, of date of July 3, 1956, showing that the election had carried 131 for to 50 against, stated that the notice of the election was published "in the Tate County Democrat, a newspaper published in the Town of Senatobia, Tate County,

Mississippi, in which the Town of Coldwater is situated'', being the same language as was used in the resolution; and the mayor and Board of Aldermen of Coldwater, on August 7, 1956, in adopting the report of the election commissioners recited that ''notice of said election was given and said election was held in accordance with and as required by the laws of the State of Mississippi and by the aforesaid resolution of this Mayor and Board of Aldermen.''

It was shown that the notice of the advertisement for bids for the construction of a distribution system for the town was given for an insufficient time.

It was shown that the Town, without complying with Section 3519-24, Code of 1942 Rec., as to notice of the price, terms and conditions thereof, entered into a contract to lease to North Central its system to be acquired with an option of North Central to purchase; that North Central was in desperate financial condition and unable itself to perform such a contract; that Woodruff came upon the scene, and, by means of a loan of $85,000 to North Central, took over the complete management of North Central, with an option to purchase all of its property at any time within ten years from the date thereof; that T. E. Bostic, the manager of Woodruff for the past 18 years, was also made the manager of North Central, and was also made the manager of the Town's system when and if it was acquired, and that with him, as the guiding pilot, Woodruff would be in complete control of the distribution system even though this co-operative was not even qualified to do business in the state and had no certificate of convenience and necessity from the Public Service Commission; that the printed, but not validated bonds, in the amount of $98,500, were sold, without advertising, to J. S. Love Company, the broker for Woodruff, and after consummation thereof, the bonds and the purchase price thereof were redelivered to J. S. Love Company in escrow; that thereafter North Central, with-

out a permit from the Public Service Commission, except for 3½ miles, procured five Co-Operatives to make extensive improvements and convert 8 or more miles of its lines from 1-phase to 3-phase at a cost of $35,000, and that Woodruff also did considerable work thereon without a permit from the proper authority.

It was further shown that, from the inception, W. G. Durley was Mayor of Coldwater and was a Director and the Secretary of North Central, except that he resigned just before the execution of the contract between the Town and North Central because he did not think that it would be proper for him to sign the contract as Mayor for the Town and as Secretary for North Central, and following the execution thereof, he was re-elected Secretary. Copies of the applicable minutes of the Mayor and Board of Aldermen of Coldwater, attached as exhibits, were introduced in evidence. Copies of the pertinent minutes of the Board of Directors of North Central were also introduced in evidence, together with copies of the contracts and mortgage between North Central and Woodruff, as well as the contract and agreement between North Central and the Town of Coldwater.

Succinctly stated, the gist of this proof was to the effect that the Mayor and Board of Aldermen of Coldwater, after approval by a majority of the qualified electors, issued the bonds in the sum of $98,500 for the purpose of acquiring an electric distribution system, and sold the bonds to J. S. Love Company for its client Woodruff; that the governing authorities of the Town had no real purpose to operate the system themselves, but rather to acquire North Central's system, and, under a lease and purchase agreement, when North Central had paid the full cost of the system, including the bonds and interest, the Town would then convey the system to North Central; that North Central was in poor financial condition and could not make such a commitment until it perfected an agreement with Woodruff whereby that

corporation would, in fact, take over the management of North Central under a like option to purchase the system at any time within ten years; that, to assure overall control by Woodruff, the North Central co-operative would continue its organization, but T. E. Bostic was made manager of the system for all three of the interested parties, namely, Woodruff, North Central, and the Town. Besides, according to the report of the engineers, it was estimated that, within one year, the new system, because of the cheaper rates then obtaining to the patrons of North Central and which rates were to be effective under the lease and sale agreement, would acquire 95% of the users of electricity within the Town, and, on that basis, it was concluded that the purchasers of the bonds would have a safe investment. With the loss of such a large number of its customers, the complainant would not be able to operate its property in the Town of Coldwater at a profit.

The defendants denied the conclusions of the adversary pleadings, but of course the municipal minutes, those of North Central, and all of the contracts in writing were indisputable. However W. G. Durley testified that the reason why he endeavored to negotiate the contract between the Town and North Central was that they "were trying to get cheaper power in Coldwater".

From these allegations and proof, the complainant maintained, among other contentions, (1) that the advertisement for bids for the construction of the system was void; (2) that the contract of sale and lease between the Town and North Central, not approved by the qualified electors of the town, was void; (3) that the election and the bonds attempted to be issued and sold thereunder were illegal and void; (4) that North Central was required to get a permit from the Public Service Commission before doing the work complained about and changing the line from 1-phase to 3-phase; (5) that the several illegal acts proved that the Town, North Central and

Woodruff had formed a conspiracy to deprive the complainant of its property and vested rights; (6) and that for the foregoing, and other, reasons, the temporary injunction should be made permanent.

The court held that the contract of lease and sale, and the advertisement for bids for the construction of a system were both void. He declined to adjudge whether the issuance and sale of the bonds was valid for the alleged reason that other taxpayers had not been joined. He held that it was not necessary to obtain a permit to do the work, which, it was shown, had been performed. He found as a fact that the charge of conspiracy had not been sustained. He dismissed the cause as to Woodruff, and declined to make the injunction permanent for the stated reason that he did not believe that either Coldwater or North Central would violate the terms of the decree which the court was then rendering. The decree was dated November 1, 1957, and the complainant appealed therefrom.

The complainant, on December 3, 1957, filed in this court its application for a writ of supersedeas, exhibiting thereto copies of certain resolutions adopted by the Mayor and Board of Aldermen of the Town of Coldwater on November 24, 1957, which (1) Directed the town clerk to give notice of the board's intention to receive bids for the construction of an electric distribution system, together with the form of notice, (2) Rescinding a resolution adopted on June 26, 1957, which provided for the acquisition of an electric distribution system for the Town, and for the issuance and sale of bonds in the amount of $98,500, and for the confirmation of the sale thereof to J. S. Love Company, and (3) Rescinding an agreement entered into as of June 26, 1957, between the Town and North Central, and which provided for the lease and sale of the Town's distribution system when and if it was obtained. These resolutions have been referred to by counsel on both sides and have been treated as if

they were a part of the record in this case. The requested writ of supersedeas was denied. 99 So. 2d 443.

The complainant, following such denial, also filed, in the United States District Court for the Northern District of Mississippi, a suit against the defendants which involved substantially the same questions as were raised in the State court with the additional questions which resulted from the action of the Mayor and Board of Aldermen of the Town at its meeting on November 24, 1957. The cause was heard in that court, and the learned District Judge held that: (1) Since the date for the reception of bids for the construction of a distribution system for the Town had passed, that question was moot. (2) As to the issuance and sale of revenue bonds in the sum of $98,500, it was recited that the same had been cancelled by resolution of the Mayor and Board of the Town ''and said $98,500 Bond Issue is void and cancelled''. (3) He adjudged that the complainant's franchise in the Town, and its contract for furnishing power for pumping water, and for street and stop lights was valid. (4) He further held that, while the Town had the right under the law to acquire a municipal electric distribution system, its powers are circumscribed by statute, and it must act within those powers, but it has no right to award a contract until funds therefor are lawfully available. The date of that decision was July 17, 1958. This proceeding has been referred to by both sides to this controversy. The defendants therein appealed, but the same parties, the appellees here, state in their brief in this cause, that, while the Town appealed, this Court may treat that appeal as dismissed.

The appellant has assigned and argued 16 grounds for a reversal thereof, but it is necessary for a determination of this cause, to notice only the grounds, which were dealt with in the trial court, and which are enumerated in a former paragraph of this opinion.

The trial court was correct in holding that the original notice of the advertisement for bids for the construction

of an electric distribution system was insufficient and void. Besides, there is no cross-appeal.

The trial court was manifestly right in holding that the contract of lease and sale between the town and North Central, not approved by the qualified electors of the Town, was void. Sec. 3519-24, Code of 1942 Rec. This question is completely out of the case because the record also shows that, on November 24, 1957, the Mayor and Board of Aldermen of Coldwater rescinded this contract. Neither the Town nor North Central appealed from the decree. The Court wants it understood that it is not joining in the condemnation of the contract merely because it was not voted upon. That was a sufficient ground —but there are several other serious questions not necessary to be considered here.

■■ ■ Since there was no newspaper published in the municipality of Coldwater, it was necessary, under Sec. 3598-05, Code of 1942 Rec., that the notice of the election should have been given "by publishing the same for the required time in some newspaper having a general circulation in such municipality" of Coldwater. The order for the election, as heretofore mentioned in the statement of facts, did not conform to the specific injunction of the statute, supra. There is no pretense that the authorities were acting under Sec. 5529, Code of 1942 Rec., because the resolution was not even published, nor would the language thereof be sufficient under this section. There must, of course, be due process. As a part of such, the statute, in this instance, required publication of the notice "in some newspaper having a general circulation in such municipality" of Coldwater. This prerequisite to jurisdiction was not adjudicated to exist in the resolution of intention and for the call of the election. The report of the election commissioners used the same language in regard to the newspaper as was employed in the resolution. Nor did the resolution issuing the bonds adjudicate that the notice was given by publishing the

same for the required time in a newspaper "having a general circulation in the Town of Coldwater." Obviously, this failure nullified the validity of the bonds. In Miss. Power & Light Co., v. Miss Power District (Miss.) 93 So. 2d 446, the Court said: "It is well established that a board of supervisors is a tribunal with limited jurisdiction; that it must adjudicate in its minutes every essential jurisdictional fact; and, unless this is done, it has no jurisdiction to proceed, and any action in such matter is void. If notice of the election was not published, the board could not create the district. Publication of notice is a fundamental requirement of the statute. And such jurisdictional fact must be specifically adjudicated in the minutes of the board." The opinion collated a number of decisions of this Court to the effect that such an adjudication is jurisdictional. See also Broom v. Board of Supervisors of Jefferson Davis Co. 171 Miss. 586, 158 So. 344, to the effect that a board's subsequent attempt in its final order to adjudicate a jurisdictional fact "cannot be made to relate back as a curative of its previous assumption to proceed without first having done that which was necessary to give it the jurisdiction to proceed." In this action, the appellant's rights were different from those of the public generally; and it was not barred of its right to raise the validity of the bond issue merely because it did not invite other taxpayers to join. Actually no other taxpayers were similarly situated. The Federal Court was of the view that the bonds are void and actually the record shows that they have been surrendered and canceled, and the purchase price presumably refunded. Woodruff did not appeal from the decree of the District Court. Consequently this bond issue is a nullity and passes completely out of the case.

Any municipality, under Secs. 3519-08 and 5528, Code of 1942 Rec., has the power to acquire an electric light plant and provide electric service to users therein, and,

for that purpose, to issue bonds. But the Public Service Commission, under Sec. 7716-04, Code of 1942, Rec., "shall have exclusive original jurisdiction over the intrastate business and property of public utilities as herein defined, except and provided . . . . (these exceptions have no application) . . . . Provided, further, the commission shall not have jurisdiction to regulate the rates for the following sale of commodities or services: (1) sales of gas, water or electricity by municipalities to such persons as said municipalities are authorized by law to serve * * * ,"

Section 7716-05, Code of 1942 Rec., provides in part as follows: "No person shall construct, acquire, extend or operate equipment for manufacture, mixing, generating, transmitting or distributing natural or manufactured gas, or mixed gas, or electricity, or water, for any intrastate sale, to or for the public for compensation, or for the operation of a public utility operating a business and equipment or facilities as contemplated by subsection D (3) of section 1 (Sec. 7716-01), of this act, without first having obtained from the commission a certificate that the present or future public convenience and necessity require or will require the operation of such equipment or facility." Under paragraph (b) thereof, one engaged in the business mentioned on the effective date of the act was entitled to such certificate of convenience and necessity if applied for within six months from the effective date of the act. Paragraphs (c) and (d) thereof provide for administrative details; and under the second paragraph of (d) supra, it is provided that, when more than one utility operates within a municipality, such utilities shall be subject to rate regulation, and this includes cooperatives. But it is also expressly "Provided, further, that municipally operated utilities shall not be subject to regulation under this act."

The Public Service Commission granted to North Central a permit for the improvement in the $3\frac{1}{2}$

mile line, as mentioned in the statement of facts, but it did not authorize the other construction work, which was shown to have been quite extensive in the approximate amount of $35,000 due other cooperatives. The amount expended by Woodruff does not appear although it was substantial. While North Central had been operating for several years in this area, it did not offer proof of its compliance with Sec. 7716-05, supra, for the preservation of its franchise. It conceded in its answer that ultimately it would be required to obtain a permit in this matter. The expenditure of more than $35,000 evidenced such construction or extension as to be within the contemplation of the above section. At least, it cannot be peremptorily said that it was not necessary to obtain a permit from the commission. It seems clear that the learned trial judge was in error in thus holding that it was not necessary for such permit to be obtained. Manifestly this proposition, with all of the facts, as an administrative matter, should have been submitted to the commission for its action. Until that had been done neither North Central nor Woodruff, which was not even qualified to do business in this state, had any warrant or authority therefor. This work was not being done by Coldwater within its corporate limits, but by North Central and its associates outside those limits.

A sufficient definition of conspiracy is "A combination of persons to accomplish an unlawful purpose or a lawful purpose unlawfully." 15 C. J. S. Conspiracy, Sec. 1, page 996. See also Secs. 8 and 10, thereof at pages 1003 and 1006-7.

It has already been pointed out that, under Secs. 3519-08 and 5528, supra, municipalities have the power to acquire an electric light plant and provide service to wouldbe users. Of course it is not a fraud or unlawful to do what one has a legal right to do. State v. Wilbe Lbr. Co., 217 Miss. 346, 64 So. 2d 327.

It is true that the town, many years ago, granted a franchise to the appellant. But, that franchise was

non-exclusive. The Town still had the power, under the law, even to acquire and operate its own plant. Where such facilities are already available, it may appear unwise to duplicate them. Proper service and reasonable rates would likely be the only rational grounds of grievance. But, if the utility is ready, willing and able to provide service, the public ought to be able, through its regulatory bodies, to obtain proper service at reasonable cost. Although the duplication of service may, to many, appear foolish, the wisdom of such a venture cannot be judicially inquired into. In such circumstances, the burden must rest upon the conscience of the citizenship. Private enterprise has been a boon to this country, and many people believe that its life ought not to be snuffed out by the competition of the government through subsidized agencies.

In Alabama Power Co. v. Guntersville, 177 So. 332, an Alabama case, it was held that the City's construction of an electric distribution plant pursuant to statute, and its prosecution of the business of supplying electricity, in competition with a privately-owned company to which the City had granted a franchise, was not "taking, injury, or destruction" of the company's property within the terms of the state's constitutional provision requiring due compensation therefor, in the absence of a physical disturbance of the company's business.

In Tenn. Electric Power Co. et al, v. Tenn. Valley Authority, 306 U. S. 118, 83 L. ed. 543, 59 S. Ct. 366, the opinion pointed out that Mississippi, which at that time, 1938, had no state law for the regulation of utilities, had empowered municipalities to establish and maintain electric distribution systems which may buy power from the Authority and contract as to resale prices, and had created a rural electric authority and authorized the formation of power districts and nonprofit competitives, all competent to purchase energy from the Authority and distribute it and to contract with the Authority as to

resale rates to consumers. In pointing out that local franchises did not involve the grant of a monopoly or render competition illegal, the opinion said: ''The local franchises, while having elements of property, confer no contractual or property right to be free of competition either from individuals, other public utility corporations, or the state or municipality granting the franchise,'' and that ''the damage consequent on competition, otherwise lawful, is in such circumstances *damnum absque injuria* and will not support a cause of action or a right to sue.'' Miss. Power Co. v. City of Aberdeen, 95 F. 2d 990 is likewise clearly in point.

Under Sec. 5460, Code of 1942 Rec., the purpose of the act was stated, namely, ''for the public purpose of promoting the increased use of electricity in the urban and rural areas of this State, and to enable the residents thereof to secure the benefit of the surplus power generated or to be generated by the Tennessee Valley Authority. . . .'' Whether the cooperatives, creatures of the State, and sponsored by the Federal Government, shall be permitted to invade an area already having the benefit of an electric utility must first have the consideration and approval of the regulatory bodies, that is, the Public Service Commission and the REA; and, for that reason, it is not pertinent to delve further into that question.

In the last analysis, the issue, on the question of conspiracy, was whether the Town, acting through its officials and citizens, and in concert with North Central, and through it, with Woodruff, was seeking unlawfully to deprive the appellant of its property rights, or whether, in so doing, it was simply seeking to obtain cheaper power. To get TVA power, the Town officials evidently thought that they had to travel this unusual path. Durley testified positively that he was motivated by the desire to get cheaper rates. Consequently, this Court will not reverse the learned Chancellor on his finding of fact that the conspiracy was not proved.

Since the contract of the Town with North Central has been rescinded and is a nullity, it is not necessary for the Court to consider whether North Central may purchase electricity for submetering or resale.

█ █ Regardless of whether Woodruff was, or was not, doing business in the state, when it answered and became a party to the suit, it was in court for all purposes. Since some of its rights and duties were affected by this proceeding, the cause should not have been dismissed as against it and that action of the court was erroneous.

█ █ From what has been said, it is obvious that this Court is of the opinion that the trial court should have declared the bonds to be void, and should have enjoined their delivery and should have enjoined the performance of the contract between the Town and North Central and the acceptance of the original bids. However, no bids were accepted, and both the contract and the bonds have been surrendered and cancelled. Consequently there is no necessity to enjoin something that does not now exist.

The decree of the lower court in holding the contract between the Town and North Central and the advertisement for bids to be void, and that the proof was insufficient to sustain the charge of conspiracy is affirmed.

The decree, in so far as it declined to adjudicate the bonds in question to be void, and that it was not necessary that North Central obtain a permit from the Public Service Commission, and in dismissing the bill of complaint against Woodruff Electric Cooperative Corporation, is reversed, and a decree will be entered here to the effect that the said bonds are void, that the question of whether or not a permit shall be issued is left to the decision of the Public Service Commission before which the matter is now pending, and that Woodruff Electric Cooperative Corporation be restored as a party to this litigation.

Affirmed in part and in part reversed and decree here.

*McGehee, C. J.,* and *Kyle, Holmes,* and *Arrington, JJ.,* concur.

## ON APPLICATION FOR WRIT OF SUPERSEDEAS

GILLESPIE, J.

This case was docketed in this Court on an application for a writ of supersedeas. The record has not been filed. Annexed to the application is a copy of the decree of the lower court from which the appeal is taken, the lower court's opinion, the cost bond filed by appellant, and a copy of certain resolutions of the Town of Coldwater adopted since the rendition of the final decree below.

Mississippi Power & Light Company, appellant, filed its suit in the Chancery Court of Tate County against the Town of Coldwater (Coldwater), North Central Mississippi Electric Power Association (North Central), and Woodruff Electric Power Association (Woodruff).

It appears that appellant is a taxpayer of Coldwater and owns and operates an electric power distribution system in Coldwater under a non-exclusive franchise. North Central is a rural cooperative distributing electrical energy in the vicinity of Coldwater, with about twenty customers inside the corporate limits of Coldwater. Woodruff is a rural cooperative located in the State of Arkansas. Appellant charged that North Central, Woodruff and Coldwater illegally conspired to construct and operate in Coldwater an electric power distribution system in unlawful competition with appellant's established business in that municipality; that North Central had unlawfully "heavied up" its power line to Coldwater to a three-phase line; that Coldwater had illegally issued bonds, the proceeds from the sale of which was intended to be used in the construction of a distribution system in Coldwater, which would unlawfully compete with appellant; that North Central and Coldwater had entered into

an illegal contract in connection with the operation of the proposed new electric distribution system; that the proceeds of the sale of said bonds, and the manner in which used would constitute an unlawful lending of Coldwater's credit to North Central; that Woodruff had agreed to lend certain funds to North Central to be used in carrying out the alleged conspiracy; that Coldwater had unlawfully advertised for bids for the construction of the new distribution system; and it also charged that certain acts had been done by North Central and Coldwater without requisite approval of the Public Service Commission. While the bill of complaint is not before the Court, it appears that the ultimate purpose of appellant was to secure an injunction against the defendants enjoining them from proceeding further in establishing and operating a competitive distribution system in Coldwater. A temporary injunction appears to have been issued, the terms of which are not known to the Court.

After the hearing on the merits, the lower court dismissed the bill of complaint as to Woodruff, held invalid the contract between Coldwater and North Central because of an irregularity in failing to give the people of Coldwater sufficient notice before said contract was made, and held that the advertisement for bids for construction by Coldwater of the distribution system was invalid because insufficient notice was given the people of Coldwater. All other relief was denied appellant. The final decree denied appellant permanent injunctive relief.

The relief granted appellant was on the grounds of irregularities in the proceedings by the Town of Coldwater and the court stated in its opinion that such did not mean or indicate that the agreement between Coldwater and North Central was to accomplish an unlawful act. An appeal was allowed by the lower court and appellant filed a $500 cost bond and did not apply for a supersedeas in the court below.

Fundamentally, appellant bases its right to supersedeas on the ground that Coldwater has, since the date of the final decree below, passed certain resolutions. These resolutions obviously were designed to correct irregularities which resulted in the lower court declaring invalid the aforementioned contract and advertisement for bids.

 Appellant contends in its oral argument that it is entitled to supersedeas as a matter of right. In Sartin v. Barlow, 196 Miss. 159, 16 So. 2d 372, we held that appeals to this Court with supersedeas in civil cases are matters of right only under Sections 29, 31, and 33, Code of 1930 (Sections 1163, 1165, and 1167, Code of 1942), and this only in three classes of cases: (1) Where there is a money decree or judgment, or (2) where there is a decree or judgment for the recovery or against the retention of specific property, or (3) where the decree directs the sale or delivery of real estate, in which cases a supersedeas is allowed as a matter of right where the requisite bond is given. Appeals to this Court with supersedeas from final decrees or judgments in all other civil cases are governed by Section 1169, Code of 1942. In Orkin Exterminating Co., Inc. v. Posey, 218 Miss. 611, 67 So. 2d 526, we reaffirmed what was said in the Barlow case. The decree in the present case is not a money decree; it is not for the recovery or against the retention of specific property; and it does not direct the sale or delivery of real estate. Appellant is not entitled to a supersedeas as a matter of right.

The second question presented is whether the decree wherefrom appeal is taken is capable of being enforced against appellant by any affirmative process of the lower court which could be stayed or affected by a writ of supersedeas so as to invoke the discretionary power of this Court under Section 1169, Code of 1942.

Whether this Court should exercise its discretion, as distinguished from the considerations that enter into the

exercise of such discretion, requires an inquiry into the nature and function of the writ of supersedeas in appellate procedure. In other words, is the decree appealed from such that a writ of supersedeas could affect if the application for a supersedeas should be granted?

■ ■ The function of the supersedeas is to stay the enforcement of a judgment or decree of the court below brought up for review by appeal, a suspension of the power of the lower court to issue execution or other process, or to execute such process if already issued. Its effect is to restrain the successful party and the lower court from taking affirmative action to enforce the judgment or decree. 3 Am. Jur., Appeal and Error, Section 535, et seq.; Gumberts v. East Oak Street Hotel Co., 404 Ill. 386, 88 N. E. 2d 883. ■ ■ Supersedeas will not issue to restrain a party from acting or proceeding under a judgment or decree where no process of, or action by, the court below is involved. Solorza v. Park Water Co. (Cal.), 183 P. 2d 275, and cases therein cited. However, there are situations that may be said to be exceptions to what has just been stated, as, for instance, where the judgment or decree of the lower court orders a fiduciary to distribute funds which are the subject of litigation, in which case the appellate court may have inherent power to issue a writ of supersedeas staying the lower court and the fiduciary from making such distribution pending outcome of the appeal.

■ ■ It is generally held that a self-executing judgment is not affected by a supersedeas. The decree involved in the present appeal granted appellant some of the relief for which it prayed, and as to that part of the decree we are not concerned. ■ ■ Appellant appeals from that part of the decree denying the relief sought by it. The decree appealed from adjudged that appellant, the complaining party, "take nothing"; it is a self-executing decree; no process is required for its enforcement; and there is nothing upon which a supersedeas

could operate. Nothing in that part of the decree appealed from changed the status quo of the subject of the litigation and no process could issue under the decree changing the status quo pending appeal. Therefore, no writ of supersedeas will issue when it could serve no function for which such writ is designed. Self-executing judgments or decrees are not affected by a supersedeas; and if supersedeas should issue, it would not affect the decree appealed from. 3 Am. Jur., Appeal and Error, Section 540, Gumberts v. East Oak Street Hotel Co., supra; Solorza v. Park Water Co., supra.

The third and final question raised by the application and argument is whether a writ of supersedeas may be used to obtain affirmative injunctive relief denied appellant by the lower court. It is clear to us from the application and argument in support thereof that supersedeas could perform no useful purpose for appellant unless it serve the function of an injunction to restrain Coldwater and North Central from proceeding to correct the irregularities in certain proceedings preliminary and requisite to the making of a contract between Coldwater and North Central, and the letting of a contract by Coldwater for the construction of a distribution system. It also appears that appellant did not deem a supersedeas appropriate when it requested and obtained an appeal in the lower court, and no supersedeas was there requested. In its brief appellant refers to ''subsequently developing conditions'', as convincing it that supersedeas should issue.

 Affirmative injunctive relief, denied appellant by the lower court, may not be granted in this Court under the guise of a writ of supersedeas. For reasons already stated, the decree from which the appeal is prosecuted is not such that its enforcement could be affected by supersedeas, and we may not lawfully go beyond the decree and grant affirmative injunctive relief.

Whether as a matter of substantive right appellant is entitled to the relief denied by the lower court is a ques-

tion not before us on this application. Our decision is addressed solely to the procedural matters discussed.

Application for writ of supersedeas denied.

*McGehee, C. J.,* and *Hall, Kyle* and *Arrington, JJ.,* concur.

## ON SUGGESTION OF ERROR ON MOTION TO RETAX COSTS

On November 3, 1958, a final judgment was entered reversing this cause and providing as to costs the following: "It is further ordered and adjudged and decreed that the appellant do have and recover of and from the appellees all of the costs of this appeal to be taxed, etc."

On March 14, 1959, the appellant filed in this Court a motion designated "Motion to Re-tax Costs," moving the Court to add to the amount of other costs taxable the amount which accrued to the court reporter for transcribing his notes of the evidence. It was averred in said motion that the chancery clerk did not include in the transcript a statement of the costs accruing to the court reporter. The averments of the motion were meager and unsupported by briefs of counsel, and in the light of the matter as then so meagerly presented to this Court, we overruled the motion designated "Motion to Re-Tax Costs" under the authority of Rule 19 of the Rules of this Court, providing that, "All motions to re-tax costs shall be filed within sixty (60) days from the entry of the final judgment in the case."

The appellant has now filed what it terms a suggestion of error suggesting that the Court erred in overruling its aforesaid motion. This so-called suggestion of error was filed on April 21, 1959, and a copy thereof, according to the certificate of counsel appended thereto, was, on April 21, 1959, duly mailed to opposing counsel.

The following now appears from statements of facts set forth in the so-called suggestion of error under oath:

The chancery clerk initially transcribed three volumes of the record and appended thereto a statement of his costs therefor aggregating $385.50. The other volumes of the record were transcribed by James O'Day, official court reporter, and at page 675 of this transcript he appended thereto his certificate as follows: "I, James T. O'Day, official court reporter of the Chancery Court of Tate County, Mississippi, hereby certify that I am entitled to the sum of $343.50 as fees in cause No. 6605 in said court, being for transcript of $338,500 words at 10¢ per folio, $338.50, and carrying charges on filing complete transcript of record with the chancery clerk, $5.00, or total of $343.50. I further certify that this amount has been paid."

This certificate bore date of July 30, 1958. A certificate of the chancery clerk filed herein shows that this amount was paid by the appellant.

In transmitting the record to this Court, the Chancery Clerk made a statement on the transcript of the aforesaid costs accruing to him in the sum of $385.50, pursuant to Section 1193, Vol. 2, Recompiled, Mississippi Code of 1942, but did not make a statement on the transcript of the aforesaid costs accruing to the court reporter. His explanation of this omission as set forth in his certificate attached to the document filed as a suggestion of error is that since the court reporter's certificate showed that the fees due him for transcribing his notes had been paid, he was of the opinion it was not proper for him to tax and certify to the Supreme Court said costs when he forwarded to the Supreme Court the transcript of the evidence.

██ ██ It is urged in the so-called suggestion of error that this Court erred in overruling the appellant's aforesaid motion designated, "Motion to Re-tax Costs," and that the order overruling said motion should be set aside and an order entered directing that the costs accruing to the court reporter in the sum of $343.50 be added to

the other costs taxable against the appellees. We think there is merit in this contention.

While the appellants' aforesaid motion, which was overruled on April 6, 1959, was designated "Motion to Re-tax Costs", it was not in fact a motion to re-tax costs but a motion to have said sum of $343.50 accruing to the court reporter for the transcript of the evidence added to the other costs taxable against the appellees. Said motion is in fact, and should be interpreted to be, a motion to include in the costs taxable against the appellees costs which had theretofore been omitted in taxing the bill of costs, as is provided for in Section 1595, Vol. 2, Recompiled, Mississippi Code of 1942, reading as follows:

"Costs omitted in taxing the bill of costs may be taxed *at any time upon application to the court;* but if the costs, as taxed before, have been paid, the party against whom the retaxation is sought shall have five days' notice of the application; and any erroneous taxation of costs may *at any time* be corrected by the court on application of the party aggrieved, five days' notice of the motion being given if the rights of any other than the clerk who taxed the costs be involved." (Emphasis ours)

The case is not one where it is being sought to correct the judgment as to costs. The judgment in this case taxed the costs against the appellees. It is not sought to change that judgment but only to have included in the taxable costs the item of costs accruing in favor of the court reporter, which item was erroneously omitted in taxing the bill of costs. The relief thus sought is a relief which the court may grant at any time under said Section 1595, Vol. 2, Recompiled, Mississippi Code of 1942. We treat the motion and the so-called suggestion of error as an application to the court to direct that the aforesaid item of $343.50, accruing in favor of the court reporter and omitted in taxing the bill of costs be included in the bill of costs.

Further, we deem it appropriate to say that it is not disputed that the aforesaid item of $343.50 accruing in favor of the court reporter is a proper item of costs to be taxed against the appellees and that it would be a grave injustice under the facts and circumstances of this case to relieve the appellees of this item of costs and to impose the same upon the appellant contrary to the judgment of the court which assessed all costs against the appellees.

Therefore, even if this were a motion to re-tax costs as contemplated in Rule 19 of the Rules of the Supreme Court, we would feel impelled to suspend Rule 19 under the authority of Rule 33 of the Rules of this Court, and sustain the motion, since to do otherwise would result in manifest injustice. This position finds support in the very recent case of Clara Richardson, et al. v. George V. Cortner, Trustee, 105 So. 2d 456, decided October 6, 1958. Since we treat the aforesaid motion and so-called suggestion of error as an application to this Court to correct an omission in taxing the bill of costs, and since a copy of the aforesaid motion and suggestion is shown to have been duly mailed to opposing counsel more than five days prior hereto, we are of the opinion that the provisions as to notice as set forth in said Section 1595, Vol. 2, Recompiled, Code of 1942, were sufficiently complied with and we are further of the opinion that the application designated as a suggestion of error be granted, and that the order heretofore entered overruling the motion designated as a "Motion to Re-tax Costs" be set aside and that the Clerk of this Court be and he is hereby directed in taxing the bill of costs taxed against the appellees to include therein the aforesaid item of $343.50 accruing to the court reporter for his transcript of the evidence. We may add that the record in this case discloses that the court reporter had appended thereto his certificate as to the amount due him for the transcript, and that on the basis of this certificate, the Clerk of this

Court should have included in taxing the bill of costs this item of costs.

In McDonald, et al. v. Spence, et al., 179 Miss. 348, 176 So. 607, the Court said: There seems to be no statute requiring the reporter of the trial court to file a certificate of his fee for transcribing his notes of the evidence, so that the clerk of this court, in taxing the same, must be governed by the number of words appearing in the reporter's transcript. The reporter, however, should, in justice to the clerk of this court, indicate, by certificate or otherwise, what his fee is.''

This is exactly what the court reporter did in this case, and the omission of the clerk to include the reporter's fee in taxing the bill of costs should, in all justice, be corrected by including this item in the bill of costs taxable against the appellees. Accordingly appellant's application to have said omitted item of cost included in the bill of costs should be and it is granted, and the order of this court heretofore overruling the appellant's motion to have added to the bill of costs the aforesaid item accruing to the court reporter is hereby set aside, and the Clerk of this Court is directed to include the aforesaid item in the bill of costs taxable against the appellees.

Application to have omitted item of costs included in bill of costs granted.

*McGehee, C. J.,* and *Lee, Arrington* and *Ethridge, JJ.,* concur.