**B. J. ROSS et al., Plaintiffs,**

v.

**DEPOSIT GUARANTY NATIONAL BANK OF JACKSON, MISSISSIPPI, and William D. Mounger, Defendants.**

**Civ. A. No. 72J–259(N).**

United States District Court,
S. D. Mississippi,
Jackson Division.

Oct. 10, 1974.

M. Jack Tabor, Houston, Tex., Jack A. Travis, Henley, Lotterhos & Bennett, Jackson, Miss., for plaintiffs.

Charles B. Henley, Jackson, Miss., George E. Morse, Gulfport, Miss., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

## MEMORANDUM OPINION

NIXON, District Judge.

### FINDINGS OF FACT

This suit was originally filed by plaintiffs, all residents of the State of Texas, against the defendants, Deposit Guaranty National Bank of Jackson, Mississippi (DGN), a nationally chartered banking corporation, William D. Mounger, a Mississippi resident who at all relevant times was vice-president in charge of its petroleum department, J. Paul Ratliff, a resident citizen of Tennessee and Red River Minerals Corporation, a Mississippi corporation. The plaintiffs subsequently voluntarily dismissed against Ratliff and Red River because they were unable to obtain service of process on Ratliff, and Red River had become defunct. Thereafter, plaintiffs filed their First and Second Amended Complaints against the two remaining defendants who have answered, denying that the plaintiffs are entitled to recover actual or compensatory damages against them in the amount of $3,336,000.00 and punitive damages in the sum of $1,668,000.00 or a total of $5,004,000.00 based upon a charge of fraudulent conduct on the part of the defendants and a conspiracy or scheme to defraud the plaintiffs by preventing them from obtaining possession of 1,568,000 shares of capital stock of Crusader Oil & Gas Company (Crusader) and fraudulently converting the properties of Crusader, totally destroying the value of the above stock, thus diminishing or destroying the value of the stock.

After the plaintiffs rested their case, this Court granted the defendants' Motion to Exclude and enter Judgment for them against three of the plaintiffs, James Helke, Fred Kelso and Marvin Green, because the evidence conclusively showed that they did not own or claim ownership of any Crusader stock at any time in question.

Ruling was reserved on the Motion of the defendants to exclude and enter a Judgment in their favor against the remaining two plaintiffs, B. J. Ross and Paul C. Ferguson. After considering all the evidence in this case, this Court overrules this Motion and decides this case on its merits.

Crusader was incorporated on August 11, 1958 as a Delaware corporation with its domicile in Houston, Texas, which was subsequently changed in 1959 to Pass Christian, Mississippi after J. Paul Ratliff became its president and principal stockholder. Crusader was organized under a merger plan and stock was issued to Crusader Oil & Uranium Company and Gold Empire Mining Company on the basis of .005 shares for 1. The common stock of Crusader Oil & Gas Company had a par value of $.25 per share, and its transfer office was at the corporation's office.

Ratliff, individually and as president of Crusader and with the apparent authority to do so, borrowed substantial amounts of money from DGN, evidenced by his personal promissory note dated August 23, 1956 and in the amount of $450,000.00 and three other promissory notes signed by him as president of Crusader, one dated June 15, 1959 in the amount of $28,000.00 and two dated July 29, 1959 in the respective amounts of $353,000.00 and $500,000.00. Ratliff and Crusader executed Deeds of Trust

on all of Crusader's oil and gas producing properties and in addition pledged 1,568,000 shares of Ratliff's Crusader stock as collateral to secure payment of the four notes. In addition, DGN purchased from the First National Bank of Jackson, Mississippi for approximately $68,000.00 a note which had apparently been executed by Crusader and/or Ratliff and also acquired Crusader assets pledged to secure the payment of that note. All of the oil "runs" or revenue from the above properties were pledged and paid to DGN by various lessees of Crusader in order to pay off the above notes. The defendant, Mounger, was DGN's officer originally in charge of the Crusader accounts and his duties included the receipt and application of the oil "runs" from the collateral income producing properties.

On June 25, 1965, an agreement was entered into between Ross and Ratliff (Ex. P–2) which reflected that Ross had purchased Ratliff's capital stock in Crusader and assumed certain obligations and responsibilities. At the same time, Ross fully, finally and completely released Ratliff from "all claims and causes of action of any kind or nature whatsoever whether arising out of contract, tort or any other source . . . . regardless of the nature of such claim or the cause out of which the said claim and/or causes of action may arise or may have arisen". (Ex. D–11) A copy of this agreement (Ex. P–2) and a signed revocation of proxy referring to 1,038,000 shares of Crusader stock owned by Ratliff and 20,000 shares of Crusader stock owned by Red River Minerals Corporation (Ex. P–4) were forwarded to DGN, with a letter from Ratliff dated June, 1965 advising the bank that he had sold and assigned to Ross all of his Crusader stock held by the bank as collateral to secure payment of the above four loans and authorizing and instructing the bank, after payment of the loans, to deliver the pledged stock to Ross or his nominee (Ex. P–3). At that time, the defendant

bank, through a long and difficult salvage procedure, including the purchase of the note from First National Bank of Jackson together with the assets pledged to secure the payment thereof, was able to reduce the balance owing from Crusader and Ratliff to the approximate sum of $100,000.00.

During the later part of 1965 a dispute arose over the control of Crusader between two contending factions one led by the plaintiff Ross and the other by one A. W. Dugan, Jr. This led to a called special shareholders' meeting in Houston, Texas on December 28, 1965. The defendant bank, which held the voting proxies for the stock pledged to it as collateral, was never notified of this meeting at which 75% of Crusader's outstanding stock was represented. The group led by Ross, who was chairman of the Board of Directors, was victorious and the plaintiff, Ferguson, was elected president of Crusader. Although the Ross-Ferguson faction gained control of Crusader, they were never able to obtain the books and records thereof. Consequently, Ferguson, as president of Crusader, several times wrote to Mounger and Nat (erroneously addressed "Knapp") Rogers, then president of DGN, informing them of the change in management, enclosed a certified copy of the minutes of the special stockholders' meeting and requested a copy of the monthly oil and gas runs paid to the bank on Crusader's account for the year 1966, expenditures of the bank on the account and the balance owing. They also expressed a desire to pay the balance plus accrued interest. During this time the DGN had also received telephone calls from the Dugan group which also claimed control of Crusader, asking for similar information. In view of the conflicting claims of control and beseiged by various requests for the above information, the bank, pursuant to regular banking procedures and the advice of its attorney, Mr. Scott Tennyson, who was deceased at the time of the trial of this case, informed both contending

groups that compilation of this material would be expensive and time consuming and did not give any of the requested information to the Ross-Ferguson group or the Dugan group in order to protect the confidences of its debtor, Crusader. On March 8, 1965, prior to the special stockholders' meeting, however, the plaintiff, Ross, through a reputable law firm in Houston, wrote DGN requesting certain information and copies of various instruments pertaining to Crusader and Tennyson, the bank's attorney who was then and at all subsequent times in question handling all of the bank's dealings and correspondence relating to Crusader's account pursuant to the authority of its managing officers, replied, inviting Ross and his Houston attorneys to fly to Jackson, Mississippi for a conference with DGN's president, Mounger and legal counsel, but Ross and his attorneys did not reply or respond to this invitation (Ex. D–9).

In late December, 1966, when the balance owing to the bank on the loans had been reduced to approximately $12,835.-35, DGN was contacted by Charles Edward Harper, an attorney of Jackson, Mississippi, and an offer was made to the bank by Harper on behalf of his client, one Lynn Christian, to purchase the four Crusader and Ratliff notes and the collateral securing their payment. Harper was first contacted with reference to this matter in December, 1966 by Ratliff, reportedly on behalf of and as agent for Christian, and he agreed to represent Christian in this matter after requiring Ratliff to have Christian personally contact him, which was done by a long distance telephone call from New York on approximately December 28, 1966. Christian asked Harper to represent him in the proposed payment and the acquisition of Crusader's oil and gas producing properties mortgaged as collateral. Christian further instructed Harper to follow the instructions of Ratliff with whom Christian was working or associated and informed him that Ratliff would furnish the necessary legwork to deliver the necessary instruments in connection with the proposed acquisition.

Harper's deposition testimony (Exs. P–20 and D–15) further reflects that he shortly thereafter participated in two separate meetings in the conference room of the DGN bank in Jackson with Mounger, Scott Tennyson, Ratliff and two other DGN officials which took place on December 28, 1966 and January 13, 1967. At the first meeting, which constituted the first step of the two step transaction, the original $500,000.00 note and the $28,000.00 note marked "paid" by the bank and the $450,000.00 note was endorsed without recourse by the bank and releases of Deeds of Trust or mortgages securing those notes were executed and delivered to Harper. In turn, on December 29, 1966, Harper delivered to Ratliff all of the above instruments which he received from the bank and was receipted therefor (Ex. 1 to Depos. of Harper). Between the first and second conferences, Harper wrote the defendant, Mounger, informing him that pursuant to the December 29 conference he had secured a $13,670.00 check payable jointly to the defendant bank and himself (Ex. 12 to Depos. of Harper) to pay the bank the $12,835.35 plus interest and attorney's fees for the purpose of consummating the purchase of the properties in question by Lynn Christian and asking that he be notified when the remaining documents were available inasmuch as he was ready to make the required payment (Ex. 11 to Depos. of Harper). The check was delivered to the bank on January 13, 1967 at which time Crusader's note for $353,000.00 was endorsed without recourse by DGN in favor of Christian and authorizations to cancel the Deeds of Trust on properties securing the payment thereof and the stock certificates representing the pledged · 1,568,000 shares of Crusader stock were delivered to Harper. The foregoing $13,670.20 check was a Client's Trust Account Check No. 1425 of the law firm of Laub, Adams, Forman

and Truly of Natchez, Mississippi, dated December 29, 1966 and made payable to Deposit Guaranty National Bank and Charles E. Harper, attorney, and signed by Lawrence Adams for the firm and which on its face bore the notation "For Dorchester-Ratliff". This check had been transmitted to Harper by James A. Torrey, Jr., of the Meadville, Mississippi law firm of McGehee, McGehee and Torrey. The latter firm had transmitted the check to Harper after receiving the written authorization for the release of the Deed of Trust on the Franklin County, Mississippi oil producing property of Crusader which was one of the parcels of property incumbered to secure the DGN loans to Crusader. After Harper delivered the check to the defendant bank at the January 13, 1967 conference and received all the remaining instruments in question, including the stock certificates representing the 1,568,000 shares of capital stock of Crusader which were required to be delivered by virtue of Section 238, Mississippi Code, 1942 recompiled, he was in return given a check by DGN in the amount of $53.11 which represented the difference in the face amount of the check and the total principal and interest owed the bank.

At no time has Harper ever met or seen Lynn Christian and has never talked to him nor received any correspondence from him either during or subsequent to the conclusion of the foregoing transaction with the exception of the one previously referred to telephone call by which Christian employed him. Although he wrote Christian on several occasions subsequent to the conclusion of the above transactions, he received no reply from him and at the time that his deposition testimony was taken on May 1, 1973, he still held all of the instruments delivered to him by the defendant bank (with the exception of those that he delivered to Ratliff), including the 1,568,000 shares of Crusader stock, which he has refused to deliver to the plaintiff, Ross, despite several requests therefor by phone and a letter from

Ross received December 8, 1971 (See Ex. D–4). Ross and Ferguson visited Harper in his office in Jackson, Mississippi on March 22, 1972 and again requested delivery of the certificates for the 1,568,000 shares of Crusader stock which he was refused, inasmuch as Harper had received no authority from his client, Christian. No legal action had been brought against Harper for possession of the stock as of the date of this trial.

When Harper first conferred with Mounger, Tennyson, Ratliff and the other DGN officials on December 28, 1966, all of the mechanics for payment of the four notes and their delivery together with the collateral securing them had been agreed upon without Harper's knowledge or participation.

Neither of the defendants conspired or conferred with Charles E. Harper or his client, Lynn Christian, to conclude the payoff releases and assignments in question and received no funds or compensation of any type from anyone before or after the transaction was concluded on January 13, 1967, other than the bank receiving payment of the principal and interest owed by Crusader and Ratliff. Neither did they have any knowledge of the disposition of the pledged assets after their delivery to Harper.

By letter of January 18, 1967, Tennyson wrote several interested parties, including Ross, Ferguson, Ratliff, Dugan and Christian in care of Harper, informing them of the transaction between the bank and Harper.

The District Court of Harris County, Texas, 190th Judicial District, entered a consent or agreed judgment on December 6, 1971 in a case styled *"Crusader Oil & Gas Co., et al v. A. W. Dugan, et al"*. The plaintiff in that suit is named in the Judgment as "Gold Empire Mining Company", the successor corporation of a merger of Crusader Oil & Gas Company and Gold Empire Mining Company, which took place in 1968, and the defendants were Al W. Dugan, Federal

Land Oil Company, Robert L. Sonfield, Jr., Clyde Booth and Lynn Christian. The plaintiff in the case sub judice, Barney J. Ross, and Gary Ross, intervened individually and as representatives of Cripple Creek Corporation. That suit was filed in order to prevent a pending foreclosure by Federal Land Oil Company, owned by Dugan, who together with his attorney, Sonfield, had led the group which vied without success against the Ross-Ferguson faction for control of Crusader. Federal was foreclosing on the property which had been mortgaged to secure the $353,000.00 and $450,000.00 notes executed previously by Crusader through its president Ratliff in favor of DGN and were assigned to Christian by DGN on January 13, 1967, and in turn delivered to Ratliff by Christian's attorney, Harper. The two notes and mortgages or Deeds of Trust were subsequently acquired by Federal Land Oil Company. Neither of the defendants herein, DGN or Mounger, were parties to the Texas suit.

The foregoing judgment (Ex. D–4), inter alia, nullified and voided the assignment of all notes and land instruments from DGN to Lynn Christian which were subsequently assigned to the defendants therein and decreed and adjudged the notes satisfied and released; furthermore, title to all the remaining mineral rights and interests affected by or the subject of the assignment of notes and land instruments from DGN to Lynn Christian, regardless of the source of the title and the parties thereto, were decreed to be divided in undivided interests without warranty, as follows: One-half (½) to Federal Land Oil Company, One-fourth (¼) to Gold Empire Mining Company, and One-fourth (¼) to Cripple Creek Corporation the alter ego of Barney J. Ross. The judgment further decreed the 1,568,000 shares of stock of Crusader assigned by DGN to Lynn Christian to be the property of Barney J. Ross, and that the $450,000.00 and $350,000.00 notes were satisfied and released.

Turning now to the question of damages, subsequent to the time that the loans were made to Crusader and Ratliff and certainly during the years 1965 and thereafter, Crusader had no income other than the oil and gas "runs" or revenues from the property pledged to secure the four loans in question from DGN all of which was being received directly by the defendant bank and being applied to payment of the loan.

Crusader's annual report for the year 1965 filed with the Secretary of State of the State of Delaware on February 4, 1966 (Ex. D–1) reflects "The corporation was dormant and inactive throughout the year because no funds were available for operations".

At the December 28, 1965 stockholders' meeting at which the plaintiffs and their group gained management control of Crusader, it was reported that the corporation owed $382,000.00, including $156,000.00 to plaintiff, Ross, and in addition, owed DGN approximately $95,000.00, which latter amount was disclosed by Ratliff to Ross in June, 1965 (See Ex. D–11).

Crusader's stock had a par value of $.25 a share. As previously stated, it was organized by a merger of Crusader Oil & Uranium Company and Gold Empire Company on the basis of .005 shares for 1.

On June 25, 1965, Ross acquired the 1,568,000 shares of Crusader stock pledged to the defendant, DGN, by paying $17,500.00 cash and relinquishing a claim for return of property that he had traded to Star Point Oil Company, a wholly owned subsidiary of Crusader.

This Court finds in accordance with the National Stock Summary Sheet (Ex. D–23), that on November 4, 1966 or approximately 1½ month prior to the first step of the transaction between DGN and Harper, J. L. Schiffman & Company of Jersey City, New Jersey, offered Crusader stock on the market at $.09 a share but there were no bidders, and on March 29, 1967, approximately 2½ months after the conclusion of the

DGN-Christian-Harper transaction, Herzog & Son of New York offered Crusader stock for sale on the open market at $.10 per share and it was bid at $.01 per share. Ferguson specialized in trading in $.01 stocks, including mining stocks.

This Court finds in accordance with the testimony of Jack McLarty, a well qualified registered security dealer (See Ex. D–22), that in the latter part of 1966 and the early part of 1967 Crusader capital stock was worthless or virtually worthless. Furthermore, all of the mortgaged property which secured the loans in question were worth approximately $18,100.00 on June 13, 1967 and the economic limit of their income was reached in late 1967 or early 1968, as illustrated on Exhibits D–20 and D–21.

## CONCLUSIONS OF LAW

This Court has diversity jurisdiction of this cause of action and of the parties hereto.

The Mississippi Supreme Court has defined conspiracy as "a combination of persons to accomplish an unlawful purpose or a lawful purpose unlawfully". *Southern Christian Leader. Conf., Inc. v. A. G. Corp.*, 241 So.2d 619, 623 (Miss.1970); *Miss. Power & Light Co. v. Town of Coldwater*, 234 Miss. 615, 106 So.2d 375, 381 (1958). In the above cases, the Court recognized that it is not a fraud or unlawful to do what one has the legal right to do. See also *State v. Wilbe Lumber Co.*, 217 Miss. 346, 64 So. 2d 327 (1953). This Court finds from the facts herein that plaintiffs have failed to prove by a preponderance of the evidence that the named defendants conspired with anyone to defraud the plaintiffs. The Court recognizes that the general rule is that in an action against defendants not exclusively grounded upon conspiracy as here, where the conduct complained of constitutes a joint tort or would be actionable if committed by one defendant alone, failure to prove an allegation of conspiracy between the defendants does not defeat the plaintiffs' right to recover

against some or one of them who may have participated in or contributed to the damage which the plaintiff brings the action because the unproved allegations of conspiracy is merely surplusage and not vitally related to the gist of the action or the basis of liability. 152 A. L.R. 1148. It is therefore necessary to determine whether the plaintiffs have proved by clear and convincing evidence that the defendants or either of them was guilty of fraud by their actions or by failure to act, since under the well established law of the State of Mississippi, which is controlling in this diversity case, a party charging fraud must prove it by evidence which is clear and convincing because there is a presumption against bad motive, dishonesty and fraud and a mere preponderance of the evidence is insufficient to establish fraud. *Dabbs v. International Minerals & Chemical Corp.*, 339 F.Supp. 654 (N. D.Miss.1972), aff'd, 474 F.2d 1344 (5th Cir. 1973); *Stewart v. Domestic Loans of Brookhaven*, 199 So.2d 444 (Miss. 1967); *I.B.S. Mfg. Co. v. Dependents of Cook*, 241 Miss. 256, 130 So.2d 557 (1961). "The difficulty of proving actual fraud does not obviate the necessity of doing so; and mere suspicion, insinuation or presumption is not sufficient." *Dabbs, supra,* at p. 661.

In this case, the plaintiffs have failed to prove any fraudulent conduct or conversion on the part of the defendants or either of them by clear and convincing evidence. In all of their actions concerning the Crusader and Ratliff loans and the payment thereof, the defendants did what they had a legal right to do and were not guilty of fraud toward the plaintiffs.

In their Memorandum Brief filed with this Court subsequent to the trial of this case, the defendants deal at length with the question of tortuous contractual interference which does constitute a cause of action under the law of the State of Mississippi. Although pleadings in Federal Court need not be specific or particularized, they neverthe-

less must notice or inform defendants of the nature of the plaintiffs' claim. The Mississippi Supreme Court in *Irby v. Citizens National Bank of Meridian*, 239 Miss. 64, 121 So.2d 118 (1960) delineated the four essential elements which must be alleged and proved in order to make out a prima facie case of tortuous contract interference and held that the failure of the counter-claimant to so charge the counter-defendant warranted and required the lower court to sustain a demurrer thereto.[1]

In the case of sub judice, considering the pleadings in the light most favorable to the plaintiffs, there is a complete absence of any allegation of tortuous contract interference. Even assuming the defendants are so charged, nevertheless the plaintiffs have failed to prove each of the four essential elements thereof by a preponderance of the evidence and particularly that any interference by the defendants was wrongful and thus actionable inasmuch as this Court finds that defendants acted in the exercise of their legitimate business interests or right and that this constituted "privileged interference". *Martin v. Texaco, Inc.*, 304 F.Supp. 498, 502–504 (S.D. Miss.1969). Furthermore, the plaintiffs failed to prove that the value of their stock *would not have been destroyed but for* a wrongful interference by the defendants or either of them. *Harrison v. Prather*, 435 F.2d 1168, 1172–1173 (5th Cir. 1970); *Martin v. Texaco, Inc., supra*, at p. 502.

■ Not only is there an absence of evidence that the plaintiffs suffered damages as a direct and proximate result of any fraudulent or tortuous action or inaction on the part of the defendants but plaintiffs failed to actually prove that they suffered any damages or the amount thereof. Although under Mis-

sissippi Law the lack of a perfect measure of damages does not preclude recovery, nonetheless they must be proved with reasonable certainty and may not be speculative or conjectural. *Harrison v. Prather, supra*, at 1175; *Hunt Oil Co. v. Berry*, 227 Miss. 234, 86 So.2d 7 (1956); 227 Miss. 680, 86 So.2d 854. In addition to the fact that Crusader was not directly receiving any income (other than the oil "runs" being paid to the defendant bank), it was inoperative because of the lack of capital assets, and the economic limits of its oil and gas production was about to be reached, all resulting in its stock being worthless or virtually worthless. Additionally, there was no market for its stock if the plaintiffs wished to sell it. There were no records or books available to its management and internal strife existed in the form of an ongoing struggle for managerial control. Plaintiffs failed to prove by a preponderance of the evidence that Crusader's stock was of a certain value, if any at all, at the times in question or that their stock decreased in value by a reasonably ascertainable amount as a direct and proximate result of the charged actions or inactions of the defendants.

■ The record is devoid of any evidence which would support the award of punitive damages which must be based upon willful and wanton conduct on the part of defendants. Furthermore, under the Law of the State of Mississippi, punitive damages, which are "added damages", may not be assessed in the absence of proof of actual damages. *T. G. Blackwell Chevrolet Co. v. Eshee*, 261 So.2d 481, 485 (Miss.1972).

In conclusion, the plaintiffs have failed to prove conspiracy, fraud or other tortuous conduct on the part of the defendants or that they suffered any ascertainable damage which would warrant

---

1. These four criteria are: (1) that the acts were intentional and willful; (2) that they were calculated to cause damage to the plaintiffs in their lawful business; (3) that they were done with the unlawful purpose of causing damage and loss without right or justifiable cause on the part of the defendants (which constitutes malice); (4) that actual damage and loss resulted therefrom.

an award of actual damages or punitive damages.

Accordingly, the defendants shall present a Judgment to this Court which reflects the foregoing findings of fact and conclusions of law and dismissing plaintiffs' suit at their cost.