638 So.2d 1305 (1994)
Hunter L. ROUSSEL, Jr.
v.
Melvin B. HUTTON, Morris Gray and Mississippi Power & Light Company.
No. 89-CA-1095.
Supreme Court of Mississippi.
June 23, 1994.
*1306 Jimmie D. Marshall, Jackson, for appellant.
Michael P. Younger, Chapman & Younger, Brandon, Richard D. Gamblin, Wise Carter Child & Caraway, Jackson, for appellee.
Before HAWKINS, C.J., and PITTMAN and JAMES L. ROBERTS, Jr., JJ.
*1307 JAMES L. ROBERTS, Jr., Justice, for the Court:

I.

INTRODUCTION
In 1975, Hunter Roussel, Jr. bought 12 3/4 acres of land in Rankin County from Morris Gray, and there built a home. In 1978, Gray sold Melvin Hutton a two acre plot near Roussel's land, and sold about 7 2/3 acres of land to MP & L. Over the next ten years, Roussel opposed efforts of Gray, MP & L, and the City of Brandon to rezone various parcels of land in the area surrounding his home.[1] In 1988, Roussel filed suit against twelve defendants, including Gray, Hutton, and MP & L, alleging a conspiracy amongst the parties "to effectuate changes in the zoning ordinances which would financially benefit all the defendants." All claims against Hutton, Gray, and MP & L were dismissed on motions for summary judgment in April and October of 1989. Roussel appeals, assigning the following errors:
I. THE LOWER COURT ERRED BY DISMISSING MELVIN B. HUTTON FROM THE LAWSUIT BY WAY OF SUMMARY JUDGMENT, AND FURTHER ERRED BY AWARDING ATTORNEY'S FEES IN THE FORM OF RULE 11 SANCTIONS.
II. THE LOWER COURT ERRED BY DISMISSING MORRIS GRAY FROM THE LAWSUIT BY WAY OF SUMMARY JUDGMENT, AND FURTHER ERRED BY AWARDING ATTORNEY'S FEES IN THE FORM OF RULE 11 SANCTIONS.
III. THE LOWER COURT ERRED BY DISMISSING MP & L FROM THE LAWSUIT BY WAY OF SUMMARY JUDGMENT, AND FURTHER ERRED BY AWARDING ATTORNEY'S FEES IN THE FORM OF RULE 11 SANCTIONS.
IV. JUDGE BRIDGES RECUSED HIMSELF ON OCTOBER 9, 1989, VOIDING JUDGMENTS OF OCTOBER 10, 1989 AND OCTOBER 20, 1989.
Finding insufficient evidence that the trial judge recused himself from the case, we hold that his judgments were valid. We affirm the grants of summary judgment in favor of Hutton, Gray, and MP & L.

II.

FACTS AND PROCEDURAL HISTORY
On April 18, 1975, Roussel purchased 12.73 acres of land in the northwest quarter of section 7, Township 5 North, Range 3 East in Rankin County from Morris Gray. On March 24, 1978, the City of Brandon annexed a portion of land in Rankin County, which included the land owned by Roussel, and other land owned by Gray. The annexed property was zoned R-1, or single-family residential.
On April 19, 1978, Melvin Hutton and a partner bought two acres across the road from Roussel from Morris Gray. The deed contained the following clause:
A. Grantor warrants that grantees are free to construct a commercial establishment on the subject property and that such construction will not conflict with the zoning ordinance of the City of Brandon. This warranty is for a period of six months from the date hereof and unless construction of a commercial establishment is begun within said six months the warranty will terminate and be of no effect.
Hutton built a grocery on the property, although the land was actually zoned R-1. In 1988, the property was rezoned to commercial.
On November 13, 1980, MP & L purchased from Gray 7.68 acres of land, described in the deed as "commercial property." However, the land was actually zoned R-1. The property was subsequently rezoned commercial, over Roussel's objection. Roussel appealed to the Rankin County Circuit Court, which reversed the rezoning. On October 29, 1982, MP & L purchased a plot of land in Pearl, where it constructed its new office, rather than on the land it had bought from *1308 Gray. MP & L sold the building which had housed its former office to the City of Brandon on October 28, 1985, for its appraised value.
On June 21, 1988, Roussel filed a complaint in the Rankin County Chancery Court against Hutton, MP & L, Gray, the City of Brandon, city attorney Lem Adams, and seven other parties. The complaint alleged a conspiracy among the parties "to effectuate changes in the zoning ordinances which would financially benefit all the defendants."[2] The complaint read in part:
The plaintiff charges the defendants with a civil conspiracy. The defendants combined, colluded, and by concerted action effectively changed zoning of property within the city limits without resorting to proper legislative and statutory procedure. This conspiracy illegally deprived plaintiff of a valuable vested right, (i.e. the peacefuly (sic) enjoyment of its property).
Additionally, Roussel alleged that Gray had represented to him that the property across the street, as well as the balance of his property, would remain residential.
In addition to the count of civil conspiracy, the complaint alleged interference with peaceful possession of property, due to the illegal zoning practices; negligence of the City and Board, in allowing the rezoning; violation of a fiduciary relationship, between the defendants and Roussel as a citizen of Brandon; and a violation of the equal protection clause of the fourteenth amendment to the U.S. Constitution. Roussel sought injunctive relief, to revert property from C-2 to R-1 zoning and bulldoze any commercial structures existing on the property. He also sought damages in the amount of $1 million, and punitive damages in the amount of $5 million.
In his answer, Hutton denied participating in any conspiracy against Roussel; raised the statute of limitations and the Statute of Frauds as defenses; noted that the two-acre property had been rezoned commercial, and that commercial structures had been in plain view for ten years without any objection from Roussel,[3] and finally that he (Hutton) had several years ago divested himself of any interest in the property. Hutton charged that the suit was frivolous, requested dismissal, sanctions and attorney's fees.
Gray stated in his answer that, contrary to Roussel's allegations, he had informed Roussel at the time of his purchase that the property across the road from that which Roussel was purchasing would be developed commercially. Gray further stated that contrary to Roussel's allegations, he had never represented to Roussel that the balance of his property would remain residential.
MP & L's answer raised the defenses of laches, waiver, statute of limitations, Statute of Frauds, and estoppel. MP & L denied all allegations of conspiracy, and requested dismissal, sanctions, and attorney's fees.
On December 8, 1988, Hutton filed a motion for summary judgment. The motion was granted on April 14, 1989, by Chancellor Billy Bridges, dismissing him with prejudice from the suit. Finding the complaint "frivolous" as against Hutton, he ordered Roussel to pay "attorney's fees and/or sanctions in the amount of $4,100."[4]
On July 24, 1989, Gray filed a motion for summary judgment. He requested a total of *1309 $12,041 in legal fees and expenses incurred defending against Roussel's complaint.
MP & L filed for summary judgment on August 7, 1989, and requested legal fees of $14,638.75, and litigation expenses of $1,400.57.
Relevant portions of depositions taken from the parties are summarized below.

Hunter Roussel, Jr.
Roussel stated that he had moved into his home in 1977. He could not remember exactly when construction had started on the Hutton property across the road from his property, but that he thought it was some time after April of 1978. He stated that a convenience store had been opened "back off the road maybe 300 to 400 feet." He stated that he did not at the time know who owned the property, and that he purchased a newspaper and cigarettes there almost every afternoon. Roussel said that he "didn't particularly like" the store being there, but that he had had no objection to it at the time because he didn't know that it was "operating illegally." He did not discover that the store was operating illegally until the hearing on MP & L's application to rezone its property from R-1 to C-3, held in February of 1981. At this time, Roussel stated, he brought it to the attention of the City that commercial establishments were operating illegally on land owned by Gray and MP & L.
Asked if he had any facts to support his theory of conspiracy, Roussel stated that he had a deposition "in which one of the conspirators admits that all parties knew but that's the end of all parties knew, but none of the parties involved at that point laid any significance to it, and they continued on with this conspiracy." The following exchange was typical:
Q. What did they (MP & L, Gray, and Lem Adams) conspire to do?
A. They conspired to find a location where MP & L could build a facility that would allow them to vacate this present City Hall that we're in today so that the City of Brandon could acquire this property to use as a City Hall.
Q. Okay. Tell me what's illegal about that. If they conspired  if the City conspired with MP & L to find a location for MP & L to relocate to, that's it. Tell me what's illegal about that?
A. There's nothing illegal about that.
Q. Okay. So there's no conspiracy there, then, is there?
A. Oh, yeah. The conspiracy is that they conspired to rezone that property for MP & L in order to effect the transaction that they were not conspiring about.
Q. Was there something illegal about the rezoning hearing that took place over the MP & L property?
A. I wouldn't say that it was illegal ...
As to MP & L's participation, Roussel suggested that the company had requested the language in the deed permitting commercial establishments, which stated that such construction would not conflict with Brandon zoning laws. He also believed that Hutton had made a similar request.
Questioned further about MP & L's involvement, Roussel explained:
I don't remember using the word fault. I don't have my  that copy of the deposition here, but I think it was words to the effect that MP & L was a party, more or less, to this thing because their was agreement between the City of Brandon and MP & L to convert the MP & L office building in downtown Brandon to City Hall, and they had a deal whereby the City would relocate MP & L, and MP & L would, in turn, sell that structure to the City for use as a City Hall ...
I have no actual documents to show that MP & L did anything that you can nail to the wall, you know. However, they were a party to transformation of the downtown property to City Hall, and that's really what this whole thing evolved around as far as MP & L is concerned. The fact that they purchased a piece of property with a warranty in it that said it was commercial property, and in my opinion, it was MP & L's thoughts that they could just go through the motions of rezoning this thing if it were necessary. I don't even know when they found out it was necessary, but *1310 they did, and they either let the City or instructed the City to have their property rezoned, applied for rezoning. They did not show up at the public hearing, which means they were leaving someone else to do their work. To my knowledge, they did not participate at all in the rezoning of this property, which means to me that they were letting the City of Brandon carry the ball for them ...
Roussel stated that he "couldn't quarrel" with MP & L purchasing the property from Gray, and agreed that any landowner has a right to have property rezoned. He further agreed that no commercial development had taken place on the land MP & L had purchased from Gray. However, he still believed that some wrongdoing had taken place. He stated:
(w)hat we're not talking about is what part did MP & L play in this thing when they were dealing with an attorney who was representing both sides of the matter as far as m and the City was concerned. That's what throws them into the conspiracy ...
(M)orris Gray is a client of Lem Adams, and Lem Adams is the City attorney, and Lem Adams handles all of the legal end of all rezonings that happen in the City of Brandon, and MP & L was dealing with Lem Adams, who was the man that was  that wrote the deed and notarized it on the land that they bought, and also is the City attorney, and Lem Adams is one of the common threads that goes all the way through this thing. Once that zoning matter was over and decided in the Supreme Court, I suppose you could say that MP & L, the thread of MP & L ended at this time, but they were involved with it, and they were involved with an attorney that was in conflict of interest by representing all of the parties that wanted this land rezoned ...
Roussel explained how MP & L and the City of Brandon were "in cahoots":
(t)he transaction that both of them wanted could take place, and that was to  for MP & L to build a new facility within the city limits of Brandon, which would keep a tax base for Brandon, and that MP & L would, in turn, sell their facility on town square in downtown Brandon to the City to enlarge City Hall.
Roussel conceded that there was nothing improper about the relationship between MP & L and the City prior to their purchase of the Gray property, and that MP & L had "a perfect right" to sell that property to anybody they wished. However, he explained, MP & L had become a part of the conspiracy:
(e)ven though (MP & L) were informed at the closing when they bought the piece of property from Morris Gray that the land was, in fact, not commercial property ... they proceeded to try to get this piece of land rezoned, if not on their own known initiative, at least on an initiative through the City to do this, to have the property rezoned, knowing that Lem Adams was the city attorney and knowing that Lem Adams was also the attorney who closed the piece of property out for the man they bought the piece of property from. In my opinion, MP & L ... had the responsibility at that time to stand back and look at the picture and say hey, let's investigate this thing some more. We're dealing with an attorney who is representing both sides of this transaction, and that attorney happens to be on one side an attorney for the City of Brandon and on the other side for the land owner. If an attorney at MP & L attended the closing and knew those facts, I think that it was his responsibility, fiduciary or whatever you want to call it, as an attorney representing MP & L, to look at these facts and something should have popped in his mind saying we better stand back and look at them real good because this could be a situation where we could be in violation of some laws...
Roussel also cited as wrongdoing on MP & L's part that they had not attended the hearing on rezoning of the property, instead "depend(ing) on the City to voice for them and the City didn't even do that. The City just went through the motions." Finally, Roussel stated that while MP & L's involvement ended once the rezoning of its property was reversed, he still considered MP & L part of the conspiracy, because they had *1311 conspired against him, and because they had not apologized to him.

MP & L
James Pilgrim, who worked for MP & L in 1977 as local manager in Brandon, and later as director of area development, stated that at the time he contacted Gray about purchasing the property, he believed that it was zoned commercial, because there was a commercial structure or structures located on the adjacent property. He also stated that at the time of the purchase, both MP & L and Gray knew that the property was in fact zoned residential, not commercial. He stated that he had approached Gray prior to the sale, advising him that MP & L wanted the zoning changed, and that they wanted him (Gray) to pursue the matter. Gray agreed to seek rezoning.
Pilgrim stated that he did not know who had requested the language permitting commercial development in the lease. He also stated that to his knowledge, MP & L had not filed an application to rezone the property; he believed that the rezoning process began with Gray going to the City to request it. He stated that to his knowledge, no one from MP & L had testified at the rezoning hearing or otherwise participated in the rezoning procedure.[5] Pilgrim denied that Roussel's name had ever come up during the negotiations, and that none of the parties that he had dealt with had ever expressed an intent or motive to harm Roussel. He also stated that no city official had ever insinuated or discussed any understanding between the City and whereby the City would rezone any property that MP & L would relocate to if MP & L would give the City a good deal on the building it sold to it.
Also deposed was Robert Loflin, Jr., whose responsibilities with MP & L as Director of General Services during the relevant period included recommending the purchase and disposal of real property. Loflin stated that in 1984, the City had requested a right of first refusal for the purchase of the MP & L building when MP & L was planning to sell.[6] Loflin and MP & L granted this request. He stated that the building was appraised in early 1985 at $190,000, and sold to the City in October for that price. Loflin stated the property purchased from Gray had been for sale since 1982, with no takers.
Loflin stated that he did not know Hutton or Gray, and had not discussed anything with them. He did not know of any agreement among MP & L, Gray, Adams or the City of Brandon concerning the purchasing and rezoning of the land.

Morris Gray
Gray stated that he had lived for 13 years on three acres of land contiguous to Roussel's, and that he made his living buying and selling land. He stated that he had informed Roussel prior to selling the property to him that he planned to build commercial buildings on the property across the street.
Gray denied participating in any conspiracy with the City, its officials, Lem Adams, MP & L, or Hutton to harm Roussel. He stated that he had not made any deal with the City, or talked to the City concerning rezoning the property sold to MP & L. Roussel's lawyer then read from a prior deposition of Gray, taken in 1984 during other litigation between Roussel and Gray. In this earlier deposition, Gray had indicated that he had known prior to the closing that the property was not zoned commercial. The deposition was read:
Question "(a)t the time you indicated to them that that was commercial property in your deed, didn't you?" Your answer: "I think they put it in there that it was commercial property, but that was a mistake because I told my lawyer at the time that it was not commercial property, and *1312 they were talking to the City at the time to get it zoned commercial ..." (Q)uestion: who was your lawyer then?" Answer: "Lem Adams. They knew it because they had already talked to the City, and the City said they would zone it commercial. They knew it was not zoned commercial."
(Vol. 3 at 456).

Melvin Hutton
In his deposition, Hutton denied participating in any conspiracy with Gray, MP & L, the City of Brandon or Lem Adams to commit wrongful acts.[7]

Royce Baker
Royce Baker, mayor of Brandon from July 1977 to July 1981, acknowledged that the rezoning action on the MP & L property had been initiated by the Board in February of 1981. He stated that a rezoning action could be initiated by anyone, but was usually done by the property owner or prospective owner. However, he stated that there was never any agreement between the City and MP & L that MP & L would sell the City its building, the City would rezone the property for MP & L. He further denied any conspiracy to find MP & L a suitable property, or to rezone any property in an illegal fashion.
At the close of Gray's deposition, attorneys for several of the defendants stated that they would demand to be dismissed from the suit, and would request sanctions against Roussel. Roussel denied that his suit was frivolous:
Y'all make these statements that this thing is frivolous, but you don't give any reasons. I think we have plenty of evidence here to show that it's not frivolous even on Mr. Hutton. The fact that somebody didn't set down in a closed room with cigar smoke and make a plan to accomplish all of this does not keep it from being a conspiracy, and I think you attorneys need to go back and read what the Code says a conspiracy is, and I plan to pursue this thing all the way to the United States Supreme Court, if I have to, because I have been done wrong, and it has cost me almost  my health is going bad now it's getting so bad, it's dragging out so long, my health is going bad. I have considered moving out of the City of Brandon. I'm selling my place and just getting the hell out of here because I can't get any satisfaction out of the legal system in this county, and if it takes going  I have already contacted the ACLU. I hate to go to them. I've always been one of these people that thought they didn't take anything that was anything but racial, but I've already contacted the ACLU and if I have to go to some of these places outside of whatever the courts of Mississippi can do for me, I will do it because I have been done wrong, and just because Mr. Gray was maybe not a willing conspirator or Mr. Hutton was not a willing conspirator, and by that, I mean sitting down and making a plan, there still was a conspiracy by actions of these people to participate in this thing, and I plan to pursue it to the end.
On September 29, 1989, the Chancellor granted MP & L's motion for summary judgment and sanctions. Finding the suit as against MP & L frivolous, the Chancellor ordered Roussel to pay MP & L $16,039.32 in attorney's fees and expenses.
On October 6, 1989, the Chancellor granted Gray's motion for summary judgment and sanctions. Roussel was ordered to pay $12,041.25.
On October 9, 1989, Roussel filed a "Motion to Recuse," which stated in part:
Lem Adams ... has had a long relationship with the Chancellor, Billy Bridges, and contributed $1000.00 to Judge Bridges' recent reelection campaign, which proved to be extremely successful.
In the middle to late 1970's, Judge Bridges owned and developed property which was purchased from Morris Gray, one of the defendants herein. This property was in the same general area as the property which forms the subject of this lawsuit.
Roussel asserted that because of these relationships, "there is no way that Judge *1313 Bridges can render a fair and impartial decision in this case."
The Final Judgment with respect to MP & L was entered on October 10, 1989. The Final Judgment with respect to Gray was entered October 20, 1989.
On January 26, 1990, Roussel filed a Motion to Reconsider in the Rankin County Chancery Court. The motion stated that Judge Bridges had recused himself on October 9, 1989, and that discovery had not been completed. Roussel requested that the orders dismissing these defendants be vacated and set aside. On February 14, 1990, Roussel filed a motion with this Court styled "Amendment To Motion To Reconsider, Request For Jury Trial, Filing of New Evidence, And Request For Oral Hearing With Court Reporter Present." The motion purported to present new evidence, including 1) a January 7, 1981 newspaper article, in which then-mayor Royce Baker stated the city's plan to buy the MP & L building in order to house all city operations under one roof, and: 2) a page of the minutes of the February 3, 1981 board meeting, in which it was stated that the board had initiated the matter of rezoning on the MP & L property.
On May 10, 1991, Roussel filed a motion with this Court styled "Motion For Leave To File Supplemental Material." Attached to this motion is a petition, apparently written and filed by Roussel himself, styled "Petitioner's Response To Omissions In Appellant's Response to MP & L's Argument (And Hutton and Gray Arguments).[8] Roussel states that his attorney had "failed to amend the Appellant's Response as (he) had asked," prompting him to submit this petition with various exhibits attached. Among other arguments, the petition suggests that sanctions were wrongfully imposed against him personally, because "Rule 11(b) sanctions are intended for lawyers ... (they) are not intended for non-lawyers."[9]
MP & L filed a motion to strike Roussel's Motion to Supplement and Petition, on the grounds that it was untimely, frivolous, and failed to comply with Supreme Court procedure. Hutton and Gray filed a "Response" to Roussel's motion and Petition, also requesting that both be stricken.
On September 15, 1989, Roussel filed an appeal to this Court from the judgment dated August 18, 1989. On November 10, 1989, he filed an appeal from the judgment dated October 10, 1989.
III.
DISCUSSION OF ISSUES
I. THE LOWER COURT ERRED BY DISMISSING MELVIN B. HUTTON FROM THE LAWSUIT BY WAY OF SUMMARY JUDGMENT, AND FURTHER ERRED BY AWARDING ATTORNEY'S FEES IN THE FORM OF RULE 11 SANCTIONS.
II. THE LOWER COURT ERRED BY DISMISSING MORRIS GRAY FROM THE LAWSUIT BY WAY OF SUMMARY JUDGMENT, AND FURTHER ERRED BY AWARDING ATTORNEY'S FEES IN THE FORM OF RULE 11 SANCTIONS.
III. THE LOWER COURT ERRED BY DISMISSING MP & L FROM THE LAWSUIT BY WAY OF SUMMARY JUDGMENT, AND FURTHER ERRED BY AWARDING ATTORNEY'S FEES IN THE FORM OF RULE 11 SANCTIONS.
Roussel contends that there are "numerous disputed material facts" which should have precluded the granting of summary judgments in favor of Hutton, Gray and MP & L. Roussel further contends that in awarding sanctions, Judge Bridges did not *1314 require any proof as to the amount of attorney's fees expended by Hutton.
Roussel cites several excerpts from Hutton's deposition, claiming that such excerpts support his theory that Hutton was involved in the conspiracy. While it is difficult to be precise as to what, exactly, is evidence of the conspiracy, it appear that the excerpts provided are meant to show that 1) Hutton and Gray agreed that the deed would include language to the effect that a commercial building could be built on the property Gray was selling to Hutton; 2) Lem Adams represented both Hutton and Gray in the transaction; 3) the mayor had told Hutton he could construct a commercial building on the property, provided that construction begin within six months of the execution of the deed, and that he (Hutton) had obtained a permit from the City of Brandon and began construction; 4) Adams had drafted the clause concerning commercial building, based on information from Gray elicited during negotiations for the sale.
Roussel cites excerpts from Gray's deposition, to support his theory that the relationship between Gray and Lem Adams is an "integral part of this conspiracy." These excerpts illustrate that 1) Gray first employed Adams in 1973 or 1974; 2) Gray conveyed a residential lot to Adams as part payment for services, and had paid Adams' airfare for a trip to Honolulu; 3) Gray had discussed with Hutton his plans to build stores on the property, and had some casual discussion with the mayor about these plans, 4) Gray thought the land was zoned commercial "because it was a dirt pit," and 5) Gray relied on Adams to prepare the deed and all documents relating to the closing on the property, but that he did not know at whose request the language about commercial construction had been written into the deed.
As evidence of MP & L's participation in the conspiracy, Roussel suggests that MP & L and the City of Brandon attempted to have the property rezoned prior to the time MP & L actually owned it. Specifically, Roussel cites Pilgrim's deposition for evidence that the City heard the zoning application on the MP & L property one week prior to the purchase date of the deed. Roussel contends that "(t)his evidence, by itself, should be sufficient to defeat MP & L's motion for Summary Judgment since it is a material disputed fact." It is not clear from this statement what, exactly, is disputed.
The brief submitted jointly by Hutton and Gray asserts that summary judgment was properly granted, because the record is devoid of any evidence of involvement in the conspiracy Roussel alleges.[10] The brief also asserts that attorney's fees were properly awarded, the reasonableness of which were supported by submitted affidavits. They note that Roussel filed no counter affidavits contesting the amounts. Hutton and Gray contend that further sanctions are merited by Roussel's appeal of this case, arguing that since the suit was found by the trial court to be frivolous, the appeal is frivolous as well.
MP & L's brief also asserts that Roussel "totally and completely failed to develop any evidence" supporting his allegations of a conspiracy. In answer to Roussel's argument concerning the initiation of rezoning procedures one week before the execution of the deed, MP & L argues that 1) MP & L did not initiate or participate in the rezoning application, and 2) the timing of the initiation of the rezoning process is immaterial, since all procedures were properly followed, Roussel had an opportunity to participate in them, and in fact ultimately prevailed. MP & L also contends that sanctions against Roussel were appropriate, and that additional sanctions are merited under Supreme Court Rule 38.

A. Summary Judgment
This Court employs a de novo standard in reviewing a grant of summary judgment. Owen v. Pringle, 621 So.2d 668 (Miss. 1993); Pace v. Financial Sec. Life of Miss., 608 So.2d 1135, 1138 (Miss. 1992). A trial court may grant summary judgment if the pleadings, depositions, answers to interrogatories and admissions on file, together with *1315 the affidavits, if any, show that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. See M.R.C.P. 56; Morgan v. City of Ruleville, 627 So.2d 275 (Miss. 1993); Drummond v. Buckley, 627 So.2d 264 (Miss. 1993); Owen, supra. A material fact is one which "tends to resolve any of the issues properly raised by the parties." Morgan, supra, citing Webb v. City of Newton, 583 So.2d 946, 949 (Miss. 1991). Evidentiary matters before the court must be considered in the light most favorable to the nonmoving party. Skelton v. Twin County Rural Elec. Ass'n., 611 So.2d 931, 935 (Miss. 1992). However, the nonmoving party may not defeat the motion merely by making general allegations or unsupported denials of material fact; it must set forth specific facts showing that there are indeed issues for trial. Drummond, supra; Palmer v. Biloxi Regional Medical Center, 564 So.2d 1346, 1356 (1990).
We look to the record, viewing the evidence in the light most favorable to Roussel, to determine if he has raised any issues of material fact sufficient to defeat the motions by Gray, Hutton and MP & L for summary judgment.

B. Conspiracy
Roussel alleges a civil conspiracy. In the context of civil conspiracy, this Court has stated that a conspiracy is "a combination of persons for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully." Shaw v. Burchfield, 481 So.2d 247, 255 (Miss. 1985), citing Mississippi Power & Light Co. v. Coldwater, 234 Miss. 615, 636, 106 So.2d 375, 381 (1958). See also Ryals v. Pigott, 580 So.2d 1140, 1156 (Miss. 1990). Civil conspiracy resulting in damage may give rise to a right of recovery. Shaw, supra, citing Bailey v. Richards, 236 Miss. 523, 537-8, 111 So.2d 402, 407-8 (1959).
For example, in Ryals, supra, this Court upheld the trial court's rejection of a civil conspiracy claim, which alleged that several landowners and a Sheriff had conspired to interfere with the plaintiff's business enterprises. The Court held that the trial judge had correctly found that the plaintiffs had failed to prove the elements of a civil conspiracy. Ryals, 580 So.2d at 1156.
In the case at bar, we examine the record to determine if Hutton, Gray, or MP & L combined with each other or with other defendants for an unlawful purpose, or a lawful purpose unlawfully, as Roussel has charged in his complaint.

Melvin Hutton
Hutton, with a partner, purchased two acres of property from Gray in April of 1978. There he constructed a convenience store. The deed from Gray warranted that commercial construction was permissible, although the land had evidently been zoned R-1 upon its annexation to Brandon in March of 1978. In 1981, during the MP & L rezoning, Roussel brought to the City's attention that the commercial establishments were operating "illegally" on residential property. According to Roussel, the City then "advertised to rezone the parcel to C-3, highway commercial." On the advice of his lawyer, Roussel did not object to this rezoning. Sometime later, several years prior to the instigation of this suit, Hutton sold his interest in the property.
There is no evidence that Hutton knew, when he purchased the land and built his convenience store, that the land was zoned residential, as opposed to commercial. Therefore, there is no evidence that Hutton "conspired" with Gray (or any other defendant) to achieve an "unlawful purpose, or a lawful purpose unlawfully." When it became apparent that the land was in fact zoned residential, rezoning procedures were initiated, and the land was rezoned C-3, or Highway Commercial. Therefore, Roussel's contention that the Hutton, together with other conspirators "effectively changed zoning of property ... without resorting to proper legislative and statutory procedure" is without merit, since lawful procedures were apparently followed.
Moreover, the evidence is not persuasive that Hutton's development of this land deprived Roussel of the peaceful enjoyment of property, as he alleges in his complaint. Roussel stated in his deposition that while he "didn't particularly like" the convenience *1316 store being there, he had no objection to its presence until he learned, several years later, that the land was zoned residential. The store was located "back off the road maybe 300 to 400 feet" across the street from Roussel's property; Roussel stated that he bought cigarettes and newspapers there almost every day. These facts are not suggestive of any deprivation of Roussel's peaceful enjoyment of his property.
In sum, Roussel's allegations of Hutton's participation in a conspiracy are unfounded. Hutton was properly dismissed from the suit on a motion for summary judgment.

Morris Gray
Morris Gray conveyed property to Hutton and MP & L by deeds containing language warranting that the land was zoned commercial. It is unclear when Gray became aware that the land was in fact zoned residential. He stated in his 1988 deposition that he learned of this when "he started selling (it)." An excerpt from a 1984 deposition suggests that Gray knew prior to selling the land to MP & L that it was zoned residential, not commercial. In short, a question of fact has been raised as to whether Gray knowingly sold land zoned for residential use, while asserting its commercial nature. However, this question of fact, while possibly a source of dispute between the parties to the contract, is not probative of any conspiracy between Gray and any other defendant.
Truth be told, it is difficult to determine what conduct on Gray's part Roussel alleges to be evidence of a conspiracy against him. When asked at his deposition what Gray did to conspire with MP & L concerning the property sold to MP & L, Roussel stated:
He benefited by the sale. He let the City handle the rezoning of it. Of course, it wouldn't have been his responsibility to do it to start with, but at the same time, he's going to push all of his other land through at the same public hearing or back-to-back public hearings and back-to-back whatever they do, orders or ordinances in the next meeting, in the regular meetings, and he just rode the horse right on through with the MP & L thing.
Further in the deposition, Roussel stated that Gray had "conspired with Lem Adams to have his land rezoned from residential to commercial." Roussel appears to be saying that Gray applied to have some of his land rezoned, and that the City rezoned the MP & L property after Gray sold it. Selling land and utilizing the zoning process are both lawful activities; therefore, it makes no sense to say that Gray "conspired" with MP & L to sell them land, or "conspired" with his attorney to have his property rezoned. Neither is there any indication of an "unlawful purpose" underlying Gray's actions, or of intent to harm Roussel in the process.
In sum, Roussel's allegations of Gray's participation in a conspiracy are unfounded. Gray was properly dismissed from the suit on a motion for summary judgment.

MP & L
In 1980, MP & L purchased about seven and a half acres from Gray, with plans to build a new office. According to James Pilgrim, local manager in Brandon, MP & L learned that the property was zoned residential sometime prior to execution of the deed. Nevertheless, the deed contained language stating that the property was commercial. Evidently, one week before execution of the deed, the City, not MP & L, initiated proceedings to rezone the property from residential to commercial. The land was rezoned, and Roussel appealed. The Rankin County Circuit Court reversed, reverting the property to its residential zoning. In 1982, MP & L purchased property in Pearl, where it built its new office, and in 1985, sold the building in Brandon housing its former office for its appraised value to the City of Brandon.
Roussel alleges that the City of Brandon cut some sort of deal with MP & L, whereby the City would rezone a piece of property for MP & L, in exchange for a good price on the MP & L office, which the City would convert to its City Hall.
Again, however, there is no evidence that any action taken by MP & L was unlawful, or that it was taken lawfully for an unlawful purpose. Obviously, MP & L had a legal *1317 right to purchase property from Gray, and to sell property to the City of Brandon. It is a bit strange that MP & L would sign a deed stating that the property it was purchasing from Gray was commercial, while knowing it to be residential. Nevertheless, this is not evidence of a "conspiracy" to circumvent zoning ordinances, especially since (according to Pilgrim) MP & L informed Gray before execution of the deed that they wanted the property rezoned commercial, and Gray agreed to pursue the matter.
Lawful, appropriate procedures for rezoning were followed to bring the property into compliance with MP & L's plans for building an office. Rezoning need not be initiated by the property owner; the City may initiate the process on its own. In short, although as Roussel puts it, MP & L was "letting the City of Brandon carry the ball for them," there is nothing illegal about such action, neither is it indicative of an underlying illegal purpose.
Moreover, Roussel ultimately prevailed in the zoning process concerning the MP & L land. On appeal by Roussel to the Rankin County Circuit Court, the land was rezoned to residential, and MP & L never developed the property. Finally, nothing in the testimony of MP & L officials or other evidence so much as suggests that MP & L harbored any intention of harming Roussel.
In sum, Roussel's allegations of MP & L's participation in a conspiracy are unfounded. MP & L was properly dismissed from the suit on a motion for summary judgment.

C. Sanctions

M.R.C.P. 11
M.R.C.P. 11 states in part:
(b) Sanctions. (i)f any party files a motion or pleading which, in the opinion of the court, is frivolous or is filed for the purpose of harassment or delay, the court may order such a party, or his attorney, or both, to pay to the opposing party or parties the reasonable expenses incurred by such other parties and by their attorneys, including reasonable attorneys' fees.
This Court has stated that "a pleading or motion is frivolous within the meaning of Rule 11 only when, objectively speaking, the pleader or movant has no hope of success." Bean v. Broussard, 587 So.2d 908, 912 (Miss. 1991), citing Tricon Metals & Services, Inc. v. Topp, 537 So.2d 1331, 1336 (Miss. 1989). See also Stevens v. Lake, 615 So.2d 1177, 1183 (Miss. 1993); Smith v. Malouf, 597 So.2d 1299, 1303 (Miss. 1992).
The Court further stated in Tricon Metals that as to the question of whether a party had any hope of success, "(this Court's) inquiry is an objective one to be exercised from the vantage point of a reasonable party in (the litigant's) position as it filed and pursued its claim." Tricon Metals & Services, Inc., v. Topp, 537 So.2d at 1335. See also Nationwide Mutual Insurance Co. v. Evans, 553 So.2d 1117, 1120 (Miss. 1989).
Therefore, in assessing the propriety of sanctions awarded to Hutton, Gray, and MP & L, we question whether a reasonable person in Roussel's position would have had any hope of success in pursuing this lawsuit.
As discussed above, Roussel deposed a number of defendants, seeking evidence of the conspiracy he firmly believed had operated "illegally" to rezone property in Brandon, benefiting the conspirators at his expense.
The depositions yielded no proof of Roussel's alleged conspiracy. The statements of the defendants described the purchase, sale, and rezoning of various parcels of land in Brandon  all lawful activities to be expected in a growing community. Certainly, these activities were conducted to "benefit" the parties involved; this is the nature of business transactions. However, since buying, selling, and rezoning land are all legal activities, there can be no such thing as "conspiring" to commit them. Moreover, the evidence shows that proper zoning procedures were followed by the City of Brandon, further contradicting Roussel's allegations of wrongdoing. In fact, Roussel successfully availed himself of these procedures, obtaining a reversal of the rezoning of the MP & L property. It is fair to say that a reasonable person would view the transactions described (buying, selling, and rezoning land) as lawful business deals, and not, as Roussel insists, evidence of a "conspiracy" to "effectuate changes in the zoning ordinances." Additionally, *1318 a reasonable person would not view himself as the target of such a conspiracy.
The question of whether a reasonable person in Roussel's position would have had any hope of success in pursuing this lawsuit may further be addressed by reviewing the excerpts from Roussel's deposition included above.
In sum, a reasonable person would not have had hope of success in pursuing this suit. The pleadings and motions in this case were therefore frivolous within the meaning of M.R.C.P. 11, and sanctions were correctly imposed against Roussel.
Finally, it may be noted that as with all matters entrusted to the discretion of the trial courts, this Court hesitates to disturb sanctions imposed below. The Court stated in Tricon Metals:
Our trial courts have a certain amount of discretion not only in determining whether sanctions should be assessed but also with regard to the quantum of sanctions. This discretion generally ought be exercised in the context of the facts of the particular case, the language of Rule 11 and its dominant purpose of deterrence.
Tricon Metals, 537 So.2d at 1337. There appears no evidence of an abuse of discretion by the chancellor in assessing Rule 11 damages against Roussel. Therefore, they are affirmed.

D. Additional Sanctions under Rule 38
Appellees Hutton, Gray and MP & L have requested sanctions against Roussel under Rule 38. They contend that Roussel has prosecuted this appeal "out of sheer obstinacy" and "for the sake of obsessive dislike."
Rule 38 of the Mississippi Supreme Court Rules provides:
In a civil case to which Miss. Code Ann. § 11-3-23 (Supp. 1986) does not apply, if this Court shall determine that an appeal is frivolous, it shall award just damages and single or double costs to the appellee.
The Comment to the Rule states that damages may include attorney's fees and other expenses incurred by an appellee. See Turner v. Turner, 612 So.2d 1141, 1144 (Miss. 1993); Hurst v. Southwest Miss. Legal Services, 610 So.2d 374, 387-88 (Miss. 1992); Russell v. Lewis Grocer Co., 552 So.2d 113, 117 (Miss. 1989). This Court has "evaluated Rule 38 frivolity by reference to Tricon Metals & Services, Inc. v. Topp," supra; that is, by reference to M.R.C.P. 11. Hurst, supra, citing McGowan v. Marx, 546 So.2d 699, 700 (Miss. 1989).
As discussed above, the Court finds that Roussel had no hope of success in this suit, and therefore that his pleadings and motions were frivolous within the meaning of Rule 11. In that we "evaluate[] Rule 38 frivolity by reference [to Rule 11]," we strain no logic in holding that Roussel's appeals of the summary judgments and Rule 11 sanctions were also frivolous. Accordingly, we impose sanctions under Supreme Court Rule 38 in the amount of $1500 against Roussel for these appeals.

IV. JUDGE BRIDGES RECUSED HIMSELF ON OCTOBER 9, 1989, VOIDING JUDGMENTS OF OCTOBER 10, 1989 AND OCTOBER 20, 1989.
Not appearing in the record, but appended to Roussel's Reply Brief is (apparently) a transcript from a hearing held October 9, 1989, before Judge Bridges on the motion to Recuse. Counsel for appellees deny receiving notice of this hearing. Roussel testified that he believed Chancellor Bridges could not be impartial in judging the case, because he had accepted a $1000 campaign contribution from Lem Adams after the suit had been filed. Roussel's counsel added that this created an appearance of impropriety. Judge Bridges stated that this was the first time he had heard that Adams had donated $1000 to him, and that he did not know if this were true. He stated that "his (Adam's) firm may have given me some money," but if so, his committee had not informed him. The Chancellor stated that he would "certainly make an investigation into that to see." Roussel added that he was not accusing the Chancellor of any wrongdoing, stating, "I just don't feel like I can get a fair and impartial trial before your Court." The Chancellor responded:

*1319 Well, I'm going to give you the opportunity to get a fair and impartial trial with another judge because I think the fact that Mr. Adams is involved as a member of the bar would be sufficient for me to recuse myself ... (s)o I will, sua sponte, recuse myself from this proceeding, and I will allow you the opportunity either to select by agreement another judge ...
The statute provides that I either go (sic) the governor and recuse myself or let him appoint one, or I think there's an alternate method (sic) now to make provision for the Supreme Court to appoint one. Or if you all want to, by agreement of the parties, select a judge, then I can sign an order for a special chancellor.
(By Mr. Marshall): All right, sir. I would like the opportunity to see of we can do one by agreement.
(By the Chancellor): All right, sir. I think you need  tell me when you're going to do that then. If you don't, I need to prepare a letter recusing myself to the governor.
No letter, order, or other document in the record indicates that the Chancellor in fact recused himself. That is, the only "evidence" of recusal is the purported transcript of the hearing. However, the transcript is not properly part of the record in this case, appearing as it does appended to Roussel's reply brief. Roussel neither designated the transcript as part of the record on appeal, nor followed the correct procedure for amending the record to include it. The transcript, and order of recusal (assuming there was one) could have been placed in the record by means of a motion to supplement. This Court has stated:
We have on many occasions held that we must decide each case by the facts shown in the record, not assertions in the brief, however sincere counsel may be in those assertions. Facts asserted to exist must and ought to be definitely proved and placed before us by a record, certified bylaw; otherwise we cannot know them.
Mason v. State, 440 So.2d 318, 319 (Miss. 1983) (citations omitted). The Court takes judicial notice of the fact that Chancellor Bridges is no longer the judge of record in this case. However, Roussel's contention that his recusal (assuming it occurred) renders void the October 10th and 20th Final Judgments as to MP & L and Gray, is without merit.[11]

IV.

CONCLUSION
Roussel conducted discovery in pursuit of evidence of the conspiracy he alleged to have occurred involving the sale and rezoning of property in Brandon. Roussel deposed, among others, defendants Gray, Hutton, and MP & L officials James Pilgrim and Robert Loflin, Jr. The trial court found that Roussel had demonstrated no issue of material fact pertaining concerning the involvement of Gray, Hutton or MP & L, and accordingly granted summary judgment. A review of the record supports the judge's conclusions; summary judgment was appropriate with regard to all three defendants so dismissed from the suit. The judge acted within his discretion in imposing Rule 11 sanctions against Roussel; the awards of attorneys fees are affirmed. Additional sanctions under Supreme Court Rule 38 are imposed against Roussel in the amount of $1500. Finally, there is no evidence properly before this Court that the trial judge recused himself from the case. Therefore, Roussel's argument that the judge's post-judgment orders were void is without merit.
*1320 SUMMARY JUDGMENT FOR HUTTON, GRAY & MP & L AFFIRMED. RULE 11 SANCTIONS AGAINST ROUSSEL AFFIRMED; ADDITIONAL SANCTIONS AGAINST ROUSSEL IN THE AMOUNT OF $1500 IMPOSED PURSUANT TO MISSISSIPPI SUPREME COURT RULE 38.
HAWKINS, C.J., PRATHER, P.J., and SULLIVAN, PITTMAN, BANKS, McRAE and SMITH, JJ., concur.
DAN M. LEE, P.J., not participating.
NOTES
[1] This Court has decided two other Roussel-related cases. See Gray v. Baker, 485 So.2d 306 (Miss. 1986); Roussel v. City of Brandon, 475 So.2d 823 (Miss. 1985).
[2] In his answers to Gray's interrogatories, Roussel stated that "the results of this conspiracy were to be land which was zoned commercial which would be more valuable, both to the city as a tax base and to Morris Gray."
[3] Roussel stated in his deposition that the reason for his delay in bringing the suit was because he had difficulty finding a lawyer willing to take the case. He said that he had attempted to have attorneys who had represented him in other matters before, but that "(i)t's hard to get one of you guys to take an action against another lawyer."
[4] On June 5, 1989, Hutton filed a motion to cite Roussel for contempt, for failure to pay the attorney's fees. On June 19, 1989, Roussel requested an order certifying an interlocutory appeal to this Court. On June 29, 1989, Chancellor Bridges granted Hutton's motion for contempt, ordered payment of the $4,100, plus attorney's fees of $250 and all costs associated with the contempt motion. He denied Roussel's motion for certification. On July 19, 1989, a Writ of Garnishment was executed against Deposit Guaranty in the amount of $4600. On August 15, 1989, Chancellor Bridges granted Melvin Hutton's Motion to Turn Over Funds, and ordered Deposit Guaranty to tender the amount of $4,657.50 to Hutton.
[5] During Pilgrim's deposition, it was developed that the City of Brandon Board of Alderman had, on November 6, 1980, decided to "run the legal notice on the application for amendment of the zoning ordinance for the property located at the end of Crossgates Boulevard where MP & L plans to erect a district office," and set a hearing for December 2, 1980. The deed from Gray to MP & L was dated November 13, 1980, one week later.
[6] At that time, some Brandon city offices were located in the MP & L building. According to Pilgrim, MP & L provided the space free out of "civic mindedness."
[7] Only a small portion of Hutton's deposition is in the record. Pages appearing are 4-5, and 49, and 51.
[8] The preface to the petition stated in part:

The petitioner considers this document to be authorized by the First Amendment to the United States Constitution and by Article 3, Section 10 of the Mississippi Constitution as a petition to the Government for a redress of grievances.
[9] Roussel asks:

How can a judge sanction me when so many licenced attorneys took my money and told me I had a good case... (i)f the case is frivolous and without merit, shouldn't any sanctions be against those professional, licenced and Bar qualified attorneys who took my money and assured me I had a good case?
[10] The brief also states that Hutton sold the land in question several years before the suit was filed in 1988.
[11] Moreover, it is not evident that the Chancellor's recusal, had it in fact taken place, would have any bearing on the Final Judgments against MP & L or Gray. Roussel's motion to recuse cited Lem Adams' alleged contribution to Judge Bridges' campaign as the basis for recusal. It also cited the sale of property by Gray to Bridges in the late 1970's as suggestive of an appearance of partiality. Discussion at the October 9, 1989 hearing on the motion alluded to both Adams' and Gray's purported relationships with the judge. However, the judge's stated reasoning for recusal cited only the Adams contribution. Therefore, there is no indication that the judge thought recusal was proper with respect to Gray, or to MP & L. Judgments of a court of competent jurisdiction are presumed valid. Kirk v. Koch, 607 So.2d 1220, 1223 (Miss. 1992), citing Vinson v. Johnson, 493 So.2d 947, 949 (Miss. 1986). See also Jackson v. State, 199 Miss. 853, 25 So.2d 483 (1946).