ISHEE, J.,
 

 for the Court.
 

 ¶ 1. The Circuit Court of Claiborne County entered an order granting summary judgment in favor of Lum Properties, Ltd. (Lum Properties) and Martha B. Lum (Lum), individually, and in her capacity as general partner of Lum Properties. The order was entered against Wilton Helveston. The order disposed of his claim for conversion of certain property he had left on Lum’s land at the expiration of a lease. Aggrieved by the order, Helve-ston appeals, arguing that the circuit court’s granting of the motion for summary judgment was in error. Finding no error with the order granting the motion for summary judgment, we affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. Helveston originally entered a lease agreement with Lum Properties to lease certain land in Claiborne County, Mississippi to use as hunting land. The initial lease ran from July 1, 1999, through June 30, 2002. Eighteen days after the expiration of the first lease, the parties entered into a second lease that ran from July 16, 2002, through July 15, 2005. The initial lease provided that Helveston would lease the approximately 1,100 acres at the price of $21.50 per acre for the first year, with annual increases to $22.50 and then to $24.50 per acre. In the second lease the parties agreed to a price of $25.50 per acre, with annual increases to $26.50 and then to $27.50 per acre. Both leases contained a clause providing that any property left on the land for more than thirty days after the expiration of the lease would become vested in Lum Properties.
 

 ¶ 3. As the term of the second lease came to a close, Helveston contacted Lum seeking to lease the property for a third time. Lum initially indicated that she
 
 *785
 
 would not enter another lease with Helve-ston, instead desiring to use the property for tree farming. However, in April 2005, the parties discussed a ten-month lease that would run from July 16, 2005, through May 31, 2006, for which Helveston would pay the rate of $27.50 per acre. Instead of accepting this lease, Helveston sent Lum a correspondence on April 24, 2005, requesting a three-to-five-year lease. Helveston’s proposal did not specify a price. Lum responded on May 17, 2005, rejecting Helveston’s proposal and indicating that they would prepare a new ten-month proposed lease containing the previously discussed terms. Shortly thereafter, Lum informed Helveston that the terms of the proposed lease were non-negotiable.
 

 ¶ 4. Helveston requested that one of his previous associates, Leoma Reed, obtain a copy of Lum’s proposed lease. Upon contacting Lum’s attorney, Sim Dulaney, Reed was told that the lease was solely for Helveston and that he would have to contact Lum directly. Helveston never contacted Lum about the proposed lease, nor did he attempt to obtain a copy of it.
 

 ¶ 5. The next contact that Helveston had with Lum was a letter he sent to her attorney offering to lease the land for the reduced rate of $20 per acre. He sent this letter on September 21, 2005, more than two months after the second lease expired. The next day, Dulaney responded to Helveston informing him that he should not return to the land and that any property presently remaining on the land at that time was forfeited per the second lease.
 

 ¶ 6. Helveston responded by filing a suit for replevin. A third party, Heritage Banking Group, intervened during the course of the litigation, asserting a security interest in the property subject to the replevin suit. Lum Properties consented to release its ownership interest to Heritage.
 

 ¶ 7. Following Helveston’s second amended complaint in which he alleged conversion of his property, Lum and Lum Properties filed a motion for summary judgment. Their motion alleged that Helveston presented no evidence that the first or second lease was invalid; therefore, under the forfeiture clause, Helve-ston’s property properly vested in Lum and Lum Properties. They also argued that there was no evidence of improper actions on their part to support Helve-ston’s claim for equitable estoppel. They concluded that Helveston’s action for conversion should fail because title to his property properly vested in Lum and Lum Properties per the terms of the second lease after Helveston failed to claim the property for more than thirty days after the second lease expired.
 

 ¶ 8. The circuit court agreed with Lum and Lum Properties and granted the motion for summary judgment in their favor. The circuit court concluded that equitable estoppel was inapplicable because Helve-ston presented no evidence that the parties were engaged in negotiating another lease. To the contrary, the circuit court found that the evidence reflected that the lease offered by Lum was non-negotiable. With no recognizable claim for equitable estop-pel, the circuit court concluded that the property properly belonged to Lum and Lum Properties per the lease agreement. Therefore, Helveston’s claim for conversion had to fail because he had lost his ownership interest in the property. Helveston timely appealed from the order granting summary judgment.
 

 STANDARD OF REVIEW
 

 ¶ 9. This Court’s standard of review regarding a circuit court’s grant of a motion for summary judgment is as follows:
 

 The Court employs a de novo standard of review in reviewing a lower court’s
 
 *786
 
 grant of summary judgment motion.
 
 Roussel v. Hutton,
 
 638 So.2d 1305, 1314 (Miss.1994). Summary judgment is appropriate if the evidence before the Court-admissions in the pleadings, answers to interrogatories, depositions, affidavits, etc. — shows there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.
 
 Newell v. Hinton,
 
 556 So.2d 1037, 1041 (Miss.1990). This Court does not try issues on a Rule 56 motion, but only determines whether there are issues to be tried.
 
 [Miss.] Ins. Guar. [Ass’n]. v. Byars,
 
 614 So.2d 959, 963 (Miss.1993). In reaching this determination, the Court examines affidavits and other evidence to determine whether a triable issue exists, rather than the purpose of resolving that issue. Comment, Miss. R. Civ. P. 56.
 

 Miss. Gaming Comm’n v. Treasured Arts,
 
 699 So.2d 936, 938(¶ 11) (Miss.1997).
 

 DISCUSSION
 

 ¶ 10. Helveston cites only one alleged point of error — that the circuit court erred in granting summary judgment in favor of Lum and Lum Properties. He argues that the circuit court, in granting summary judgment, erroneously made improper findings of fact that should have been left for a jury to decide.
 

 A. The Lease Provision
 

 ¶ 11. The contractual provision dealing with the property presently at issue reads as follows:
 

 Upon expiration or cancellation of this lease, Lessee shall have thirty (30) days thereafter to take and remove from the land any and all equipment or other personal property owned by Lessee; provided that if Lessee shall fail or refuse to remove the same within such time, title hereto shall ipso facto vest in Lessor.
 

 Helveston does not take issue with the validity of the clause or with the leases in which it appeared. “[F]or well over a century, we have accepted that lessor and lessee may agree among themselves regarding title to and removal of improvements and may reflect their wishes in formal agreements this Court will enforce.”
 
 Simmons v. Bank of Miss.,
 
 593 So.2d 40, 42 (Miss.1992);
 
 see also Bondafoam, Inc. v. Cook Constr. Co.,
 
 529 So.2d 655, 658 (Miss.1988).
 

 ¶ 12. We also find no issue with the lease clause that was twice agreed upon by all parties. Therefore, the issue becomes whether Lum and Lum Properties should have been equitably estopped from enforcing the forfeiture provision based on alleged contract negotiations upon which Helveston allegedly relied when he failed to remove his property from Lum’s land following the expiration of the second lease.
 

 B. Equitable Estoppel
 

 ¶ 13. The crux of Helveston’s argument on appeal is that the conduct of Lum and Lum Properties in renegotiating the lease led him to believe that he would eventually enter another lease with them for the previously leased land. Helveston argues that Lum and Lum Properties should be estopped from enforcing the thirty-day forfeiture clause because of their conduct. According to Helveston, he only left his property on the land because he was under the impression that the parties would eventually come to an agreement and that he would secure another lease.
 

 ¶ 14. The supreme court has generally defined equitable estoppel “as the principle by which a party is precluded from denying any material fact, induced by
 
 *787
 
 his words or conduct upon which a person relied, whereby the person changed his position in such a way that injury would be suffered if such denial or contrary assertion was allowed.”
 
 Dubard v. Biloxi H.M.A., Inc.,
 
 778 So.2d 113, 114(¶ 5) (Miss.2000) (quoting
 
 Koval v. Koval,
 
 576 So.2d 134, 137 (Miss.1991)).
 

 ¶ 15. The elements required to prove equitable estoppel are as follows:
 

 Conduct and acts, language or silence, amounting to a representation or concealment of material facts, with knowledge or imputed knowledge of such facts, with the intent that representation or silence, or concealment be relied upon, with the other party’s ignorance of the true facts, and reliance to his damage upon the representation or silence.
 

 Miss. Dep’t of Pub. Safety v. Stringer,
 
 748 So.2d 662, 665(1112) (Miss.1999) (quoting
 
 Chapman v. Chapman,
 
 473 So.2d 467, 470 (Miss.1985)). The party asserting estoppel bears the burden of establishing the elements of estoppel, which that party must prove by a preponderance of the evidence.
 
 Id.
 
 (citing
 
 Chapman,
 
 473 So.2d at 470). The circuit court found that Helveston had not produced any such evidence of conduct, acts, language, or silence sufficient to establish equitable estoppel.
 

 ¶ 16. Helveston’s argument hinges on his assertion that the parties continued to negotiate for a new ten-month lease after the expiration of the second lease. He says that he did not personally participate in any negotiations, but instead, he sent Reed to negotiate for him. The only evidence of any contact between the parties prior to the September 21, 2005, letter from Helveston is a May 17, 2005, letter from Lum. That letter rejected Helve-ston’s April 24, 2005, proposal, and it informed him that Lum would prepare a new lease that would run from July 16, 2005, through May 31, 2006. The lease was to be ready by Helveston’s next trip to Port Gibson, Mississippi. There was no evidence of any negotiations that took place from the date that Helveston received the letter until Helveston made his low-ball offer more than four months later.
 

 ¶ 17. Despite Helveston’s assertions, there was no evidence to support a finding that the parties engaged in any negotiations after Lum offered a new lease to start on July 16. Helveston knew that Lum was seeking more than $40,000 for a lease of the property, including taxes on the land. The contract price had risen each year for the six years that Helveston had leased the land from Lum, up to $27.50 per acre for the final year. Nevertheless, after the parties’ negotiations, he decided to offer Lum $20 per acre, much less than Lum requested and also lower than the price he paid for the land in 1999.
 

 ¶ 18. Helveston stated in his deposition that he felt that there were “some changes taking place” in how the Lums did business, and he felt that he needed to see the proposed lease for himself. While Helve-ston may have thought there was a need to get a copy of the lease, he never personally attempted to do so. Instead, he claimed to have requested that Reed obtain a copy for him. However, he was also aware that the Lums refused to give Reed a copy of the lease and told her that the lease was for Helveston only.
 

 ¶ 19. According to Helveston, Reed was negotiating a new lease for him. In his deposition, he stated the following:
 

 Q: What has Ms. [Reed] got to do with any of this?
 

 A: She was up here. She worked for me. I can show you the check. She was over here negotiating the thing. So, okay, I’ll write Mr. Dula-ney a letter; I did and here we are.
 

 
 *788
 
 Q: Why would she tell you that? Who did she talk to—
 

 A: She talked to the Lums. I don’t know. You’ll have to call her and ask her exactly what occurred.
 

 Seemingly, Helveston’s own testimony indicates that he was unaware what was going on with the alleged negotiations.
 

 ¶ 20. With Helveston having no knowledge of the negotiations, we look to Reed’s deposition. Reed’s testimony was that she had nothing to do with negotiating a lease between the parties. In her deposition, she said the following:
 

 Q: So the only contract that you had any involvement with, according to you, would be the Lum contract; is that correct?
 

 A: Well, like I said, I would talk with the people, ... but I didn’t do anything but just talk with them as far as telling them when he was.... They would call me when he would be coming, you know, to get their money or whatever.
 

 Q: Okay.
 

 A: And I would talk with them and I would tell them. But other than that, I didn’t do anything else.
 

 Q: Okay. You didn’t have anything to do with negotiating any of the leases?
 

 A: No.
 

 Q: Not only the Lum lease but any of the other leases that he had?
 

 A: No, I did not.
 

 Q: As far as the Lum lease itself, it was executed in 2002.
 

 A: I don’t remember even seeing the leases as far as reading about them or anything.
 

 Q: That was going to be my question. Did you—
 

 A: Right. Because Ms. Lum said that was only for him. Because he had asked me at one time — I can’t remember — to look over, to do this; and she said, “No. That’s only
 
 for
 
 him.” So I never did. I never did get into what it was or anything.
 

 Q: Did he pay you to assist him with these leases[,] or were y’all just personal Mends?
 

 A: Just good friends.
 

 Q: So you were not being paid as an agent or anything like that?
 

 A: No.
 

 Q: So any calls you made on his behalf were just as a friend to him; is that correct?
 

 A: Right.
 

 ¶ 21. Helveston argues that Reed negotiated for him, but he presented no evidence that she did anything more than relay information from him to Lum, and from Lum back to him. Furthermore, there was no evidence that the conduct, actions, language, or silence of Lum or Lum Properties was in any way intended to deceive Helveston to believe that there was a contract when, in fact, there was not. What the evidence showed was that Lum offered Helveston a ten-month lease at a price that he was not willing to pay that was to begin on July 16, 2005. Thereafter, Helveston failed to inspect the lease or to engage in negotiations concerning the lease until September 21, 2005, which was more than two months after his second lease with Lum had expired.
 

 ¶ 22. Bare assertions are not enough to avoid summary judgment.
 
 Watson v. Johnson,
 
 848 So.2d 873, 878(¶ 18) (Miss.Ct.App.2002) (citing
 
 Travis v. Stewart,
 
 680 So.2d 214, 218 (Miss.1996)). The correspondence between Helveston and Lum does not indicate that any negotiations took place following Lum’s May 17 letter.
 
 *789
 
 Furthermore, besides Helveston’s assertions, there is no evidence that Reed in any way attempted to negotiate a new lease for him.
 

 ¶ 23. Ultimately, we find that there was no evidence supporting Helveston’s claim of equitable estoppel. The most that we can conclude from the evidence before this Court is that Helveston
 
 may
 
 have believed that Reed was negotiating for him. Even so, such a belief did not create an issue of material fact sufficient to withstand summary judgment. It in no way indicated that Lum or Lum Properties were engaged in any ongoing negotiations following the May 17 letter to Helveston. Furthermore, the record reveals that any such belief was unfounded.
 

 ¶24. We find that the circuit court properly granted summary judgment on the issue of equitable estoppel. Accordingly, we find that this issue is without merit.
 

 C. Conversion
 

 ¶ 25. Regarding conversion, the supreme court has stated the following:
 

 It is elementary that ownership is an essential element of conversion.... “[T]o make out a conversion, there must be proof of a wrongful possession, or the exercise of a dominion in exclusion or defiance of the owner’s right, or of an unauthorized and injurious use, or of a wrongful detention after demand.”
 

 Cmty. Bank v. Courtney,
 
 884 So.2d 767, 772-73(¶ 10) (Miss.2004) (quoting
 
 Smith v. Franklin Custodian Funds, Inc.,
 
 726 So.2d 144, 149(¶20) (Miss.1998)). “There is no conversion until the title of the lawful owner is made known and resisted.... ”
 
 Id.
 
 (citing
 
 Miss. Motor Fin., Inc. v. Thomas,
 
 246 Miss. 14, 20, 149 So.2d 20, 23 (1963)).
 

 ¶ 26. Being that we find no error with the grant of summary judgment regarding equitable estoppel, Helveston did not have a viable claim for conversion of his property. As discussed, Helveston did not challenge the forfeiture clause in the lease. Therefore, absent a showing that equitable estoppel applied, any property he left on the leased land vested in Lum and Lum Properties when Helveston did not remove it for more than thirty days following the lease’s expiration. Accordingly, we find that the circuit court properly granted summary judgment on Helveston’s conversion claim. This issue is without merit.
 

 ¶ 27. THE JUDGMENT OF THE CIRCUIT COURT OF CLAIBORNE COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ROBERTS AND CARLTON, JJ., CONCUR.